# EXHIBIT 3



# Legalgard®

**First in legal cost control**

## LEGALGARD

**OFF-SITE LEGAL BILL REVIEW OF:**
Day, Berry & Howard;
Swidler & Berlin;
Miles & Stockbridge;
Siegel, O'Connor, Schiff, Zangari & Kainen;
Porzio, Bromberg & Newman

**RECIPIENT:**

ROBERT A. WHITNEY, ESQUIRE
HOLLAND & KNIGHT
18 Tremont Street, 8th Flr.
Boston, MA  02108

Counsel To  Liberty Mutual Group

**PREPARED BY:**

CHARITY A. DOBBINS, ESQUIRE
Sr. Vice President, Special Counsel

KEVIN J. KEHNER, ESQUIRE
Legal Cost Counsel

Legalgard, Inc.
One Penn Center at Suburban Station
1617 John F. Kennedy Boulevard
Suite 700
Philadelphia, PA 19103

(800) 525-3426
(215) 814-6300
Fax (215) 814-6363

# TABLE OF CONTENTS

**INTRODUCTION/PURPOSE**                                    PAGE  1

**SCOPE**                                                   PAGE  2

**EXPLANATORY COMMENTS**                                    PAGE  4

**SUMMARY OF RECOMMENDED POTENTIAL FEE REDUCTIONS**         PAGE  5

    &bull;    **Day, Berry & Howard**                      PAGE  5
    &bull;    **Swidler & Berlin**                         PAGE  6
    &bull;    **Miles & Stockbridge**                      PAGE  7
    &bull;    **Siegel, O'Connor, Schiff, Zangari & Kainen**   PAGE  8
    &bull;    **Porzio, Bromberg & Newman**                PAGE  9

**FEE ISSUES**                                              PAGE 10

**DISBURSEMENTS**                                           PAGE 38

# INTRODUCTION

Liberty Mutual Group ("Liberty Mutual") has retained Legalgard to review legal bills of the five (5) law firms set forth below in connection with their representation of the Black & Decker Corporation and related corporate entities ("Black & Decker").  These invoices are listed in the Invoice Log attached as **Exhibit A** and summarized below:

| LAW FIRM | INVOICE DATES | LEGAL FEES | EXPENSES | TOTAL |
|---|---|---|---|---|
| Day, Berry & Howard ("Day") | 07/89-1196 | $1,947,376.00 | $140,512.30 | $2,087,888.30 |
| Swidler & Berlin ("Swidler") | 07/89-09/97 | 1,014,760.00 | 68,031.65 | 1,082,791.65 |
| Miles & Stockbridge ("Miles") | 04/94-09/97 | 75,377.00 | 9,239.04 | 84,616.04 |
| Siegel, O'Connor, Schiff, Zangari & Kainen ("Siegel") | 08/89-04/93 | 70,930.00 | 1,960.38 | 72,890.38 |
| Porzio, Bromberg & Newman ("Porzio") | 06/94-12/95 | 58,398.61 | 5,925.42 | 64,324.03 |
| **TOTAL:** | | $3,166,841.61 | $225,668.91 | $3,392,510.40 |

Black & Decker seeks to recover these amounts from Liberty Mutual  in the course of the litigation. The invoices were reviewed in accordance with Legalgard's business rules, the benchmark we typically utilize based on existing and emerging caselaw in the area of legal billing, and further evaluated on the basis of our knowledge of customs in the industry and our experience as legal cost management professionals.

# PURPOSE

The purpose of this Legal Bill Review is to assess the fairness, reasonableness and appropriateness of the billings submitted to Liberty Mutual and sought to be recovered by its insured in this litigation.

# SCOPE

Legalgard performed a line-by-line review of the firms' invoices.[1]  We evaluated:

- The format and content of the invoices, i.e., whether they contained sufficient information, itemization and detail.

- How many of the firms' personnel were being utilized and whether they were performing activities appropriate for their levels of expertise.

- Whether there was any overlap or duplication of effort and/or whether unnecessary numbers of individuals were billing for the same or substantially similar activities as other persons.

- Whether there were other inappropriate activities performed.

- Whether the disbursement charges were appropriate.

- Whether the time charges were fair, accurate and reasonable in light of the activities actually performed.

Legalgard provided:

- An identification of billing production and format deficiencies.

- An identification and quantification of inappropriate or questionable professional services and disbursement areas.

---

[1] Legalgard outlined our initial findings in the affidavit of Charity A. Dobbins, Esquire.  This report provides specific quantifications supporting that analysis and addresses in detail unreasonable, unnecessary and questionable billing practices, with respect to the firms.

2

Legalgard was not requested to and did not attempt to comment on the quality of the work performed.  Moreover, many of the billing practices that Legalgard evaluates are of such a nature that Legalgard would be able to evaluate them more thoroughly and provide more definitive conclusions by conducting an On-Site Audit.  An On-Site Audit would permit Legalgard an opportunity to review the file materials and interview the firm personnel. Legalgard has indicated those areas of billing practices for which an On-Site Audit would be particularly valuable.

Legalgard's review has identified over forty percent (40%) and as much as seventy percent (70%) of the amounts billed by these law firms as being subject to question and/or reduction in various billing categories.

3

# EXPLANATORY COMMENTS

The invoices were coded in accordance with Legalgard's internal coding parameters, in conjunction with Legalgard's business rules. Grouped entries were "unblocked" in some cases and coded as if they were individual line item entries. Where grouped time entries were divided, Legalgard followed the Quantification Methodology. This methodology is explained in **Exhibit B**.

Special measures were required to deal with the Day invoices. Many of Day's invoices were comprised of long narrative paragraphs containing hundreds of functions with a single time charge. The firm's invoice did not delineate the timekeeper who performed the function, the date on which the function was performed, the time charge or the cost per function. The methodology used to "unblock" these invoices is outlined in **Exhibit C**. A sample of a typical Day invoice is reproduced as **Exhibit D**.

4

# SUMMARY OF RECOMMENDED POTENTIAL FEE REDUCTIONS

## DAY, BERRY & HOWARD

### Fees:

| | |
|---|---:|
| Vague Descriptions | $409,193.08 |
| Intra-Office Conferences (50% reduction) | 41,482.55 |
| Administrative Intra-Office Conferences (100% reduction) | 6,887.28 |
| Duplicate Attendance | 90.00 |
| Uncovered Work | 16,405.83 |
| Questionable Motion Practice (50% reduction) | 24,735.17 |
| Attorneys Performing Paralegal Functions (reduced to paralegal rate) | 13,908.14 |
| Legal Research | 116,442.38 |
| Secretarial/Administrative/Clerical Functions | 7,049.22 |
| Questionable Secretarial/Clerical Functions | 70,073.90 |
| **Total:** | **$706,268.15** |

5

# SUMMARY OF RECOMMENDED POTENTIAL FEE REDUCTIONS

## SWIDLER & BERLIN

**Fees:**

| | |
|---|---:|
| Vague Descriptions | $ 50,733.50 |
| Intra-Office Conferences (50% reduction) | 60,943.50 |
| Administrative Intra-Office Conferences (100% reduction) | 10,740.75 |
| Duplicate Attendance | 24,035.50 |
| Duplication of Effort | 7,714.75 |
| Uncovered Work | 21,355.00 |
| Questionable/Excessive Time | 15,705.00 |
| Questionable Motion Practice (50% reduction) | 5,369.35 |
| Attorneys Performing Paralegal Functions (reduced to paralegal rate) | 12,468.75 |
| Legal Research | 37,560.00 |
| Secretarial/Administrative/Clerical Functions | 3,833.50 |
| Questionable Secretarial/Clerical Functions | 4,170.25 |
| **Total:** | **$254,629.85** |

6

# SUMMARY OF RECOMMENDED POTENTIAL FEE REDUCTIONS

## MILES & STOCKBRIDGE

<u>Fees</u>:

| | |
|---|---:|
| Vague Descriptions | $ 5,054.00 |
| Intra-Office Conferences (50% reduction) | 1,442.75 |
| Administrative Intra-Office Conferences (100% reduction) | 81.50 |
| Duplicate Attendance | 901.50 |
| Questionable Motion Practice (50% reduction) | 2,966.50 |
| Attorneys Performing Paralegal Functions (reduced to paralegal rate) | 253.50 |
| Legal Research | 5,867.00 |
| Secretarial/Administrative/Clerical Functions | 559.50 |
| Questionable Secretarial/Clerical Functions | 82.00 |
| Uncovered Work | 1,265.00 |
| **Total:** | **$18,473.25** |

7

# SUMMARY OF RECOMMENDED POTENTIAL FEE REDUCTIONS

## SIEGEL, O'CONNOR, SCHIFF, ZANGARI & KAINEN

### Fees:

| | |
|---|---:|
| Vague Descriptions | $10,105.00 |
| Duplicate Attendance | 1,310.00 |
| Questionable/Excessive Time | 6,400.00 |
| Attorneys Performing Paralegal Functions<br>(reduced to paralegal rate) | 87.50 |
| Legal Research | 1,727.50 |
| Secretarial/Administrative/Clerical Functions | 209.75 |
| Questionable Secretarial/Clerical Functions | 425.00 |
| Uncovered Work | 652.00 |
| | |
| **Total:** | **$20,916.75** |

8

# SUMMARY OF RECOMMENDED POTENTIAL FEE REDUCTIONS

## PORZIO, BROMBERG & NEWMAN

Fees:

| | |
|---|---:|
| Vague Descriptions | $ 5,831.00 |
| Intra-Office Conferences (50% reduction) | 1,306.00 |
| Administrative Intra-Office Conferences (100% reduction) | 504.50 |
| Duplication of Effort | 577.00 |
| Questionable/Excessive Time | 5,689.00 |
| Legal Research | 4,340.00 |
| Secretarial/Administrative/Clerical Functions | 4,103.00 |
| Questionable Secretarial/Clerical Functions | 971.00 |
| Uncovered Work | 243.00 |
| **Total:** | **$23,564.5** |

# FEE ISSUES

1. <u>Billing Format and Production</u>:

Based upon our review of the invoices, Legalgard has concluded that the billings submitted by these firms are not reasonable and fair. Among other issues, these invoices evidence the following billing deficiencies:

    a. <u>Poor Quality of Production</u>

The invoices produced by the firms were provided in a disorganized form. Once sorted, Legalgard determined that the invoice production included at least eighteen duplicate invoices. In addition, we identified at least twenty missing pages and nineteen illegible pages. The missing information prevented Legalgard from conducting a full invoice analysis with respect to some of the firms.

Specifically, Legalgard identified the following problems with the invoices submitted by the firms:

- **Day**

  This firm's invoices were missing pages (02/10/92, 8/07/92, 11/30/92, 07/29/93, 01/28/94, 06/19/95, 07/19/95, 09/11/95, 11/15/95).

- **Swidler**

  This firm's invoices were missing pages (<u>Bastile</u> 6/20/96 invoice), (Bostik 6/20/96 invoice ), (<u>BROS</u> 5/26/94 invoice), (<u>BROS</u> 5/26/94 invoice) and (<u>Whitman</u> 2/18/91 invoice). This firm also provided illegible invoices (document numbers 0632-0634, 0643, 0655-57, 0660-0662, 0665-0666, 0671, 10069, 10071, 100142-100146). Many of Swidler's invoices also referenced charges across several matters without any accompanying explanation for the stated balances.

10

- **Miles**

  Almost one third, or thirteen (13), of the invoices were in pre-bill format which hinders legibility. These invoices were missing any documentary support, referencing only "professional services" with an invoice amount. This format provides no accountability whatsoever for the fees charged by the firm. These invoices with "No Detail Provided" total almost $24,000.00 and fail to satisfy the mandates of ABA Formal Opinion 93-379 (December 6, 1993).

- **Siegel**

  This firm's invoices were missing pages (5/14/91 invoice), (3/13/91 invoice), (5/16/90 invoice) and (8/11/89 invoice). Duplicate invoices were also produced.

- **Porzio**

  Several invoices were missing pages (5/11, 6/20, 7/21 and 9/19/95).

b.    <u>Deficient Format of Invoices</u>

The format of many of the invoices is so flawed as to significantly hinder meaningful analysis and preclude reasonable accountability on the part of the law firms. The deficiencies included:

- The firms' billing formats often lack time itemization of specific activities, whereby paragraphs of activity descriptions are accompanied by time charges which, in many instances, exceed 100 hours. Day, for example, submitted a paragraph of activity descriptions allegedly in support of a 1,280.50 hour time charge at a cost of **$162,645.00**.

  This practice of "<u>grouping</u>", besides being in clear contravention of ABA Formal Opinion 93-379, makes it impossible to evaluate the amount of time spent performing each individual function within a grouped entry.

11

- The descriptions themselves are often so <u>vague</u> and unclear as to prevent analysis of the reasonableness and/or necessity of the work performed; the reasonableness of time charges; the utilization of personnel; whether there is duplication of effort and a myriad of other billing issues.

- The <u>identity</u> of the timekeepers performing work, as well as their professional levels, are frequently not identified, thereby precluding analysis regarding whether there is appropriate utilization of personnel, the reasonableness of individual time charges, and the extent to which duplication of effort is present.

**Recommendation:**

Legalgard typically requires that law firms utilize the billing format, illustrated in **Exhibit E**, attached. As shown in **Exhibit E**, Legalgard recommends that the individual entries show the hourly rate and the cost for the function. This information permits the bill reviewer to evaluate the cost for performing each function as well as determine the professional level of each timekeeper. Legalgard further recommends that a cumulative timekeeper summary be provided with each invoice.

The cumulative timekeeper summary should identify each timekeeper appearing on the bill, his or her professional level and hourly rate, the total hours billed by each timekeeper, and the total dollar amount charged by each timekeeper from the inception of the file, up to and including the current invoice. With this information, the bill reviewer can track the usage of personnel over the life of the case.

2.    <u>Grouping of Functions/Blocked Billing</u>:

As suggested above, a great many of the timekeepers are frequently grouping entries, wherein descriptions of more than one function are grouped together with a single corresponding time charge. For example, see the sample invoice of the Day firm **(Exhibit D)** which evidences that multiple functions were performed and listed in a run-on paragraph with a lump sum time charge.

12

- **Day**

This firm would group an entire invoice for a matter, essentially providing nothing more than a narrative invoice. This practice, combined with the omission of timekeeper information as discussed below, resulted in minimal firm accountability for over $2 million in charges. It should be noted that the firm did occasionally provide detailed, entry-by-entry invoices with timekeeper identification. These invoices were provided for the period before many of the narrative invoices.

In numerous instances, the firm submitted grouped entries with time charges over one hundred (100) hours. For example: the 4/30/92 invoice contained an entry with a 369.00 hour time charge. The 2/10/92 invoice had a 236 hour time charge. The 2/22/93 invoice contained a 461.8 hour time charge. The 10/28/93 invoice contained a 773.1 hour entry, which described 150 functions, including filing and telephone calls for an average of 15 hours per function. The 1/28/94 invoice contains a 513.7 hour entry, representing 17 hours each for the 30 functions described. The 11/30/94 invoice contained a 1,280.5 hour description, representing 23 hours each for the 56 functions described.

Legalgard finds these invoices, as well as most of those provided by the firm, to be highly suspect and representative of excessive time charges for work performed. In addition, it appears that the firm is excluding from its descriptions, although not from its charges, certain tasks performed.

- **Swidler**

The firm often grouped entry descriptions. For example: BROS, 10/24/94 invoice, 9/9/94 entry, NDG, "Phone calls to Department of State and Directory Assistance re Baumgardner Paving, Wiseman Oil, Oil Recovery and American Recovery; follow-up phone calls to individuals identified re same; phone calls to NJ Dept. of Environment re oil recovery manifests; draft letter to same requesting manifests; draft letter to NJ Secretary of State re request for Oil Recovery annual reports; phone calls

13

to Maryland Attorney General and dept. of Environment re obtaining A&A hearing transcript; meet with J. Weisman re investigation; teleconference with B. Malter re same.", 8.00 hours [at least 12 functions].

- **Miles**

  Many of the entries contained multiple functions supported by a single time charge.

- **Siegel**

  The firm often grouped entries.

- **Porzio**

  This firm usually provided time charges with respect to each activity description.

This grouping practice hinders the evaluation of the entries and fails to satisfy the "duty to render statements to the client that adequately apprise the client as to how [the] basis for billing has been applied." ABA Formal Opinion 93-379 at 5. It is impossible to evaluate the amount of time spent performing each individual function within the entry. The practice of grouping more than one activity under a single time charge impedes the ability of the bill reviewer to determine whether the time charges for individual activities were reasonable, or the amount of the minimum time charge, excessive time charges or standard time charges, if they are used. In order to perform our quantification analysis, Legalgard was required to estimate the time charges of individual tasks in grouped entries.

**Recommendation:**

Legalgard believes that the practice of grouping entries violates the mandates of proper billing for legal services. An acceptable and appropriate legal bill must provide itemized descriptions on an entry-by-entry basis with a corresponding time charge for each entry.

14

3.    <u>Vague Descriptions</u>:

Legalgard recommends that timekeepers consistently employ complete and specific descriptions when setting forth the various functions performed. For example, descriptions should include the subject or purpose of correspondence generated or reviewed as well as identifying the addressees of correspondence generated and the authors of correspondence reviewed. Similarly, participants in telephone conferences and meetings should be identified, and the general nature or purpose of the telephone conference or meeting should be provided. Pleadings and discovery documents reviewed or generated should be specifically identified. The utilization of clear, concise and complete descriptions of the functions performed significantly enhances a firm's accountability. Incomplete or vague descriptions of activities performed should be eliminated. For example, use of the descriptor "trial preparation" is insufficient to lend accountability. Instead, timekeepers should be required to set forth exactly what activities were performed to prepare for trial. All functions should be fully and completely described.

With respect to some of the billing entries, these firms describe legal functions in the invoices sufficiently. In those instances, the bill reviewer can reasonably determine what work was performed. In the great majority of instances, however, activities are described so generally that it is impossible to determine what work was actually performed. Without specific description, the bill reviewer will have difficulty evaluating the work performed (see ABA, Section of Business Law, Statements of Principles: "Each invoice should clearly identify the legal services provided..."). Vague descriptors hinder the evaluation of whether tasks performed are inappropriate, whether there is duplication and overlap of effort, and whether the time charges are unreasonable, among other problems.

This category represents the most pervasive problem identified in the invoices of these five firms - both in the number of billing entries classified as vague and in the dollar amounts of those entries. The percentage of entries identified as being vague range from five percent (5%) to just shy of twenty percent (20%) at a cost ranging from $5,054.00 (Miles) to an astronomical $409,193.08 (Day). (See Charts **D1, SB1, M1, S1** and **P1**.)

These timekeepers routinely omit the topic of telephone conversations and correspondence, and often omit the name and identity of the party involved in the conversation or to whom the correspondence is addressed. Many

15

timekeepers often simply enter "review correspondence" as a time entry with no other description - so that there is no way of knowing whether the charge is for preparing or receiving correspondence or to whom, from whom, about what subject, or for what purpose the correspondence was generated. Timekeepers routinely use vague catch-all phrases such as "work on", "attention to", "research", "preparation for" and "review" which tell the bill reviewer nothing about what particular function was actually being performed.

The use of vague descriptions renders it difficult to judge whether the activity was appropriate. For example, the correspondence reviewed by one timekeeper without description may be the same as that handled by another timekeeper, thereby evidencing a duplication of effort. Further, the correspondence reviewed may be a one-line enclosure letter, in which case the time charge may be excessive. Clearly, it is impossible to evaluate the appropriateness and necessity of any activity without knowing precisely what function was performed.

- **Day**

    In addition to the virtual omission of time charges, this firm also utilized vague descriptions. The firm's descriptions often lacked a subject matter reference with respect to telephone calls and correspondence. Further, "preparation" was not further described. The term "attention to" was used throughout the invoices, leaving the bill reviewer without any ability to determine the reasonableness of the charge. For example: 8/7/92 invoice, "attention to discovery" [Was written discovery drafted? Reviewed? Filed?]

- **Swidler**

    The firm's descriptions were often vague, providing no indication of the subject matters of telephone calls and correspondence. For example: 12/22/94 invoice, 11/3/94 entry, BLM, "Review documents." [Which documents? Why?]

- **Miles**

    Many of the references to telephone calls and correspondence

16

lacked subject matter definition.  An example of a vague entry is as follows:  1/5/96, 1/18/95 entry, SEN, "Review pleadings".  The timekeepers frequently entered "Spoke with ____", "Letter to ____", and "Telephone - ____", with no other detail.

- **Siegel**

  The firm frequently used vague descriptions with respect to telephone conferences and other activities, and peppered the invoices with useless descriptions such as the term "attention to".  For example, 4/10/90 invoice, 3/13/90 entry, AC, "Review and analysis of communications and documents.", 2.0 hrs.

- **Porzio**

  This firm utilized vague descriptions.  For example:  9/19/95 invoice, 8/4/95 entry, JRM, "review periodic mailing."; on 6/9/94 JRM billed .4 hours for "Review correspondence" and on 7/6/94 RJB billed .8 hours for "Review Company documents".  [What correspondence?  What documents?  From whom?  About what?  Were they just received in the mail or general file review?]

Without more information, Legalgard cannot evaluate the reasonableness of such charges.  Given the significant amount of time billed, it is a concern that such entries cannot be more fully evaluated.  Unfortunately, all five law firms and their timekeepers reflected in these invoices regularly used vague descriptions along with grouping of functions.

**Recommendation:**

Proper billing requires specific and detailed descriptions of the function performed in the invoices with respect to every entry.  Often the inclusion of a "re:" line will suffice in correcting a billing description problem.  Legalgard has compiled in **Charts D1, SB1, M1, S1** and **P1** those entries which are vague.  (It should be noted that vague entries which can be otherwise categorized are placed in another category.  For example, "conference with MB re: case" would be placed in the intra-office conference chart.)

17

The **Charts** reflect a total of approximately **$480,000.00** was charged for vague descriptions as follows:

| | | | |
|---|---|---|---|
| • | **Chart D1** | Day, Berry | $409,193.08 |
| • | **Chart SB1** | Swidler, Berlin | 50,733.50 |
| • | **Chart M1** | Miles | 5,054.00 |
| • | **Chart S1** | Siegel, O'Connor | 10,105.00 |
| • | **Chart P1** | Porzio | 5,831.00 |

Due to the pervasive nature of the vague descriptions and other shortcomings of these invoices, Legalgard recommends that these billing entries be deducted from the invoices. Liberty Mutual may also consider further review and evaluation of these charges, through an on-site audit.

4. <u>Minimum/Incremental Time Charge</u>:

The effective minimum charge and incremental time charge for each of these firms cannot be definitively determined, primarily due to the extensive grouping of activities and blocking of time. Legalgard noted, however, relatively few entries with a time charge of .10 and a relatively small number of entries showing time charges in the single digits while there are a large number of entries with a time charge of multiple hours. This raises a question as to the actual effective minimum time charge utilized by the firms. This also raises questions as to overestimating of time charges and inappropriate "rounding" of time charges. ABA Formal Opinion 93-379 requires that only the actual time expended on a task be billed.

- **Day**

  It is impossible to determine the firm's minimum time increment given the firm's narrative billing format.

- **Swidler**

  The firm utilized a minimum and incremental time charge of .25 hours.

18

- **Miles**

  The minimum/incremental time charge appeared to be .10 hours.

- **Siegel**

  The firm charged a .25 hour minimum and incremental time charge. The invoices contain repetitive charges for the "review and analysis of lead counsel newsletters" in increments of .25 (42 billing entries) by attorney "AC". This raises the additional issue of the use of a "standard time charge", or "unit billing", i.e., the practice of billing the same time increment for a particular task.

- **Porzio**

  The firm utilized a .10 hour minimum time charge.

**Recommendation:**

Although the practice of grouping entries on the part of these firms prevents an accurate determination of the effective minimum time charge, Legalgard submits that the minimum and incremental time charge utilized should be .10 hours, or six (6) minutes. It is clear, however, that some of these firms employ a minimum and incremental time charge of at least .25 or fifteen (15) minutes which can obviously cause dramatic increases in legal fees. It is Legalgard's position that a .25 hours minimum time or incremental time charge is excessive because many paralegal and attorney functions, such as reviews of short correspondence, preparation of correspondence and telephone calls, can be completed within six (6) minutes and charged at .1 hours.

5.    Team Approach/Overstaffing:

The utilization of personnel by these firms appears to be inefficient, and as a result, the cost of handling the litigation may be excessive. The firms appear to be abusing the "team approach". Legalgard defines abuse as utilization of more personnel than necessary to handle a case. Although a relatively large and specialized team is sometimes needed, even complex and document-

19

intensive cases can be subject to excessive staffing practices.

No matter what type of case is being handled, the team must be reasonably-sized and efficiently managed in order to minimize legal costs while also attempting to achieve the desired case outcome. Utilization of a larger than necessary team is not a cost-effective approach because it typically results in unnecessary duplication of effort, excessive intra-office conferences and excessive revising and editing, among other billing problems, all of which are evident in these invoices and discussed later in this report. Moreover, it is important that a firm correctly utilize personnel. Partners should be used only when necessary, with delegation of work to associates or paralegals wherever possible.

- **Day**

    Legalgard calculated, through evaluation of the firm's timekeeper summaries, that over this period of approximately six (6) years, a total of <u>more than seventy (70)</u> timekeepers worked on these matters, including many high level partners. This is an excessive number of personnel. Additionally, we are unable to determine the total number of hours billed by each timekeeper because of the narrative paragraph billing method used by Day - which produces a complete lack of itemization, detail or breakdown of time. Legalgard determined that only 84.4 hours were attributed to seven timekeepers on an entry-by-entry level, representing just .0064% of the firm's total hours. The remaining 99½% of time referenced no timekeepers.

- **Swidler**

    This firm billed for over forty-five timekeepers, including twenty on the <u>BROS</u> matter. Furthermore, many of the timekeepers appeared to be partner-level, some billing in excess of $300/hour. Legalgard evaluated the core team, who billed over 75% of time in this matter:

20

| TIMEKEEPER | RATE | HOURS |
|---|---|---|
| BLM | $225-$290 | 1,130 |
| NOC | $175 | 1,014 |
| JAW | $210 | 530 |
| JMK | $225 | 392 |
| WAF | $250 | 347 |
| ESW | $155 | 307 |

Over 55% of the time billed by this firm was billed by attorneys with rates over $200/hour. Most tasks can be delegated to associates. Use of partners for more than one-half the tasks billed by this firm indicates an inefficient staffing practice by this firm.

- Miles

With respect to those charges which were supported by descriptions (over $100,000 were not), it appeared that a team of approximately seven worked on these matters. They were:

| TIMEKEEPER | RATE | HOURS |
|---|---|---|
| MCH | $150-$160 | 152.3 |
| SAH | $120-$140 | 68.9 |
| JE | $55 | 61.0 |
| CRS | $125-$135 | 59.5 |
| TEL | $200-$220 | 30.2 |
| SAB | $225 | 7.4 |
| SEH | $85 | 1.1 |

Legalgard determined that three-quarters of the time billed by this firm was billed by associates. Just ten percent of the time was billed by personnel at over $200/hour.

- **Siegel**

A relatively small team of personnel worked on these matters. Legalgard identified four timekeepers:

| TIMEKEEPER | RATE | HOURS |
|---|---|---|
| AC | $125-200 | 343.00 |
| LJD | $60-75 | 28.50 |
| LAM | $100-110 | 21.50 |
| GAD | $125 | .75 |

Although a small team worked on this litigation, Legalgard determined that eighty-seven percent of the time was partner-level.

- **Porzio**

The firm utilized a team of six on these matters. They were:

| TIMEKEEPER | RATE | HOURS |
|---|---|---|
| JRM | $150 | 85.6 |
| RJB | $260 | 89.6 |
| TV | $65-85 | 67.5 |
| BTF | $150 | 7.5 |
| KJO | $100 | 5.4 |
| VCM | $85 | 2.2 |

Over one-half the time billed was billed by associates. Twenty-five percent of the time was attributable to partner-level personnel.

**Recommendation:**

Legalgard considers the Day and Swidler teams to be excessive in size. Day's inadequate format prevented further evaluation. Swidler appeared to over-utilize partners, as did Siegel.

6.    **Intra-Office Conferencing**:

As discussed above, a frequent by-product of the abuse of the team approach is the need for members of the team to have meetings, conferences or "discussions" in order to keep each other informed of the status of the case, to distribute assignments and to provide training for less experienced personnel. Although the use of vague descriptions and excessive grouping of functions hampered the evaluation of the bills, it appeared that a number of administrative, supervisory, educational and status-related intra-office conferences were billed by these firms. (See Charts D3, SB3, M3 and P3.)

It is Legalgard's position that the cost of conferences which are administrative, supervisory or status-related are overhead costs and non-billable (reduced by 100%). Quality control and assigning work are administrative costs of running the business of a law firm. Moreover, the need arises for a high number of conferences because too many people are working on these matters. Firm personnel need to meet in order to apprise each other of recent developments and delegate assignments.

Billing for an occasional conference between key attorneys where they discuss strategy is reasonable. These conferences should be held rarely, however. An _excessive_ amount of conferencing for any stated reason is inappropriate. Several of these firms routinely and regularly billed for intra-office conferencing, often with three and four timekeepers all billing for the same conference.

- **Day**

    Legalgard found several entries wherein the firm charged for internal conferences. However, given the firm's staffing, it is very likely that many more conferences were conducted and billed. The firm's vague descriptors and large block billing practices almost certainly conceal the billing of many additional conferences.

- **Swidler**

    The firm constantly held conferences and billed excessively for the conferences. For example: Bostik, 11/17/94 invoice,

23

10/20/94 entry, BLM, "Conference with EW re tasks." See **Chart SB1**. The invoices typically reflect BLM meeting with various "team members" and associates regarding "strategy", "status", "research", "assignments", and to "prepare for" or "report on" a case conference or meeting.

- **Miles**

  The firm frequently billed for intra-office conferences, some of which appeared administrative. Many of the entries identified neither the subject or purpose of the conference. See **Charts M2 and M3**.

- **Siegel**

  Based on our further review, it appears that only several intra-office conferences were billed, although they are arguably supervisory and/or status-related. See **Chart S2**.

- **Porzio**

  The firm billed frequently for intra-office conferences - often more than one per day and with time charges for both the partner and associate with a paralegal as well. See **Chart P2**.

As noted above, an additional problem with the billings reviewed is that many conferences were so vaguely described and most often with no reason or topic provided that it was impossible to ascertain the purpose of the conference. See, for example, the following:

Miles (Huth Oil), 5/24/94 invoice, 4/13/94 entry, DS, "Conference - T. Lynch", [About what? Why?]

Legalgard has compiled a further list of attorney intra-office conferences in **Charts D2, SB2, M2, S2 and P2**. Legalgard has included in these charts other conferences where the purpose and/or subject is not provided. Although Legalgard typically recommends that such intra-office conferencing and vague descriptions be subject to further review and verification before considering these entries for reduction, we have included these entries for recommended adjustment of fifty percent (50%) in this case as a reasonable

24

off-set to the overall extreme amount of intra-office conference charges, duplication and vagueness which Legalgard considers excessive.

**Recommendation:**

Legalgard recommends that Liberty Mutual seek a total reduction in the billings for the amounts charged for administrative, supervisory or status-related conferences set forth in **Charts D3, SB3, M3** and **P3** and a reduction of fifty percent (50%) for all other intra-office conferences as listed in **Charts D2, SB2, M2, S2** and **P2.** It is Legalgard's position that the firms should discontinue the practice of charging for intra-office conferences other than occasional strategy conferences between primary attorneys working on a case. If the firm reduces the size of its team, a reduction in the number of conferences should naturally occur.

7.    Duplicate Attendance/Duplication of Effort:

We previously alluded to the problem of duplication in connection with the team approach. Indeed, Legalgard found that the firms billed for duplicate attendance at functions by multiple firm members as well as duplication of effort in, for example, multiple attorneys drafting and redrafting documents.

- **Day**

  Due to lack of timekeeper identification, this area of billing cannot be evaluated. However, given the number of timekeepers involved, it is a virtual certainty that this was a problem with this firm.

- **Swidler**

  Two attorneys often attended interviews or all day PRP meetings. Duplication of effort also involved multiple attorneys reviewing the same documents. See **Chart SB5.** This was particularly true with respect to editing. For example, in June 1996, in BROS, a letter to Rollins regarding the nexus to site was drafted.

25

Although many of the entries were grouped, preventing a precise determination of the time charged, it appears that three attorneys may have spent as many as 58 hours on this letter:

| | | | |
|---|---|---|---|
| 6/13/96 | NDG | draft | 3.00 hours |
| 6/14/96 | NDG | draft | 3.50 hours |
| 6/15/96 | NDG | draft | 4.75 hours |
| 6/16/97 | NDG | draft | 5.75 hours |
| 6/17/96 | NDG | draft | 5.25 hours |
| 6/18/96 | BLM | edit/conf. | 5.00 hours |
| 6/18/96 | NDG | edit/conf | 6.25 hours |
| 6/19/96 | JAN | review/edit | 3.50 hours |
| 6/19/96 | NDG | redraft/conf | 4.25 hours |
| 6/19/96 | BLM | edit/conf | 7.00 hours |
| 6/20/96 | JAW | edit/conf | 3.50 hours |
| 6/20/96 | NDG | redraft/conf | 1.75 hours |
| 6/20/96 | BLM | review/conf | .75 hours |
| 6/21/96 | JAW | revise/conf | 1.25 hours |
| 6/21/96 | NDG | redraft/conf | 1.25 hours |
| 6/26/96 | NDG | proof/revise | .75 hours |

This highly inefficient draft and redraft practice took place throughout the invoices. Although the letter may be important, it is unlikely that it required three attorneys to spend the equivalent of seven days preparing it.

- **Miles**

  This firm appeared to bill for duplication of effort. For example, multiple personnel reviewed the same documents, shared drafting of correspondence, and participated in telephone calls. The firm also billed for the attendance of more than one professional to cover several depositions. See **Chart M4**, for example, 8/10/95 entry by JE "Monitor and attend Carl Stutzman's continued deposition, 5.60 hours."

- **Siegel**

  It does not appear that duplication of effort was billed by this firm; however, there were several charges for duplicate

26

attendance at conferences.  See Chart S3.

- **Porzio**

    Legalgard's in depth analysis determined that a small amount of duplication of effort was billed by this firm, primarily for the review of various documents.

Legalgard questions why the firms found it necessary to have more than one attorney attend conferences, meetings, depositions and hearings.  Rarely is more than one person necessary to handle such matters.  Often the presence of the additional personnel is primarily for the firm's benefit, such as for educational purposes or to ease the note-taking responsibilities of the lead attorney.  As such, Legalgard believes that billing for duplicate attendance at the same function in these matters is unreasonable.

**Recommendation:**

Legalgard has compiled a list of those entries which depict duplicate attendance.  It is Legalgard's position that the cost for secondary personnel (defined as the timekeeper who appears to be at a junior level) should be reduced from the invoices absent prior client approval as shown in **Charts D4, SB4, M4 and S3.**

Another frequent by-product of the team approach is duplication of effort by and among team members.  While some legal activities may require division of labor and multiple contribution among firm members, it is not unusual for some firms to bill for the education and training of less experienced personnel in drafting firm work product or performing other duties resulting in "learning curve charges".  **Charts SB5** and **P4** list duplicated efforts which are excessive and/or unnecessary.

**Recommendation:**

Legalgard recommends that the amounts representing the cost for junior personnel to perform the work compiled in **Charts SB5** and **P4** be deducted from the invoices.  In the alternative, Legalgard recommends further review and verification of those charges through an on-site audit.