UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


LIBERTY MUTUAL INSURANCE CO., )
                              )
        Plaintiff,            )
                              )
        v.                    )
                              )
THE BLACK & DECKER CORP.,     )  CIVIL ACTION Nos.:
BLACK & DECKER, INC.,         )  96-10804-DPW (Omnibus),
BLACK & DECKER, U.S. INC.,    )  04-10657-DPW (Bostik Middleton),
EMHART CORP., and EMHART      )  04-10684-DPW (Whitman)
INDUSTRIES, INC.,             )
                              )
        Defendants.           )


MEMORANDUM AND ORDERS
REGARDING POST-TRIAL MOTIONS
August 25, 2004

I.    Motions for Judgment as a Matter of Law  . . . . . . . . . 2

II.   Scope of Reimbursable Defense Costs  . . . . . . . . . . . 2
      A.   Pre-November 1994 Expenses . . . . . . . . . . . . . 2
      B.   Prejudgment Interest . . . . . . . . . . . . . . . . 13
      C.   Standards for Determining Reasonableness of Legal Fees
           and Costs . . . . . . . . . . . . . . . . . . . . . 15

III.  Scope of Reimbursable Indemnity Costs  . . . . . . . . . 18
      A.   "Deemer" Clause . . . . . . . . . . . . . . . . . . 19
      B.   Allocation of Damage to Individual Policy Periods . 26
      C.   "Non-Cumulation of Liability" Clauses . . . . . . . 31
      D.   Reduction for Settlement from Aetna . . . . . . . . 32

IV.   Attorney's Fees in Declaratory Judgment Action . . . . . 34
      A.   Existence of Common Law Right to Fees . . . . . . . 34
      B.   Fees for Issues Other Than the Duty to Defend . . . 38

V.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . 46

Pending before me are various post-trial motions related to the Whitman and Bostik Middleton sites.  The motions address four main topics: (1) judgment as a matter of law after trial; (2) the scope of reimbursable defense costs; (3) the scope of reimbursable indemnity costs; and (4) attorney's fees in the declaratory judgment action.

## I.    Motions for Judgment as a Matter of Law

The parties respectively press motions for judgment as a matter of law on grounds fully considered earlier in the proceedings.  I find no basis to disturb earlier rulings or the jury's verdict.  Consequently, Liberty Mutual's motion for judgment as a matter of law or partial new trial and Black & Decker's motion for judgment as a matter of law will be denied.

## II.  Scope of Reimbursable Defense Costs

### A.    Pre-November 1994 Expenses

Liberty Mutual argues that (1) the same limitations concerning pre-November 3, 1994 expenses that apply to the Bostik Middleton site should also apply to the Whitman site, and (2) those limitations exclude all defense costs as a general proposition.

Before addressing these contentions, it will be useful to review precisely what I held concerning Bostik Middleton in my December 5, 2003 Memorandum and Order.  There I distinguished

Black & Decker's response to a 1986 Notice of Responsibility

("NOR") from its response to cleanup orders that followed.  See

December 5, 2003 Memorandum and Order, Doc. 372, at 110-12.[1]  As

to the NOR, I found:

> . . . Liberty Mutual has not produced any evidence that
> it was prejudiced by this compliance with the NOR.  I
> find it unlikely that, had Liberty Mutual been able to
> assume Black & Decker's defense, it could have
> contrived a way to avoid conducting [site] assessments.
> If there was such a way, I cannot speculate as to it in
> Liberty Mutual's favor for purpose of Liberty Mutual's
> summary judgment motion.

Id. at 110.

> By contrast, as to the subsequent cleanup order, I found:

> The record contains absolutely no evidence suggesting
> that Black & Decker resisted DEP's cleanup order. . . .
> I find that Liberty Mutual is entitled to partial
> summary judgment declaring that the remediation monies
> already spent by November 1994 (when Liberty Mutual
> received notice of the claim) were voluntarily paid in
> a manner prejudicial to Liberty Mutual, and that those
> costs were therefore not covered.  In other words,
> Black & Decker's claims for indemnification for pre-
> November 1994 remediation are not recoverable.

> . . .

> My judgment at this stage is necessarily painted in broad
> strokes, so the upshot of this finding is somewhat unclear
> for the purpose of the duty to defend (as against the duty
> to indemnify).  In addition to the pre-November 1994
> remediation costs, which are excluded, Black & Decker's
> defense costs (if any) that can be specifically attributed
> to defending against the DEP cleanup order are also not
> recoverable.

Id. at 111-12 & n.26 (emphasis in original).

_____

[1]On April 19, 2004 I ordered Liberty Mutual to file separate
complaints for each claim or site.  The procedural history and
relevant submissions in No. 96-10804 are fully incorporated into
Nos. 04-10657 and 04-10684.  Memoranda and orders cited herein
were issued under the caption of No. 96-10804.

It is important to emphasize that I distinguished Black & Decker's pre-notice response to the <u>NOR</u> from its pre-notice response to the eventual <u>cleanup order</u>.  While both violated the notice and voluntary payments provisions, only for the latter could Liberty Mutual establish prejudice as a matter of law.  The difference is relatively simple: there are myriad ways to attempt to resist or modify a cleanup order, but it is nearly impossible to avoid conducting a site assessment pursuant to an NOR where there has been a solvent leak into soil.  <u>See id.</u> at 100-01.

In short, I granted Liberty Mutual's motion as to the pre-notice costs attributable (whether under the banner of defense or indemnity) to the cleanup order, because, as a matter of law, Liberty Mutual had been prejudiced by Black & Decker's response to this order.  Conversely, I did <u>not</u> grant Liberty Mutual's motion as to pre-notice costs attributable to the NOR, because I did not find that, as a matter of law, Liberty Mutual had been prejudiced by Black & Decker's voluntary site assessments.

I must emphasize what I did <u>not</u> hold.  I did not hold that, at the Bostik Middleton site, all defense costs predating notice are unrecoverable.  Nor did I hold, as a general proposition, that all defense costs predating notice are unrecoverable.  Liberty Mutual assumes that I have reached the first conclusion, and now urges me to reach the second.

In my December 5, 2003 Memorandum and Order, I explained that pre-notice <u>defense</u> costs attributable to the <u>cleanup order</u> were excluded.  <u>See id.</u> at 112 n.26.  In a subsequent January 16,

4

2004 memorandum, I observed that "[i]t may be that there is no category of expenses that fall within the duty to defend but are attributable to defending against (as opposed to complying with) the cleanup order."  January 16, 2004 Memorandum and Order, Doc. 428, at 11 n.3.  By negative implication, I clearly did <u>not</u> hold that defense costs attributable to the <u>NOR</u> were excluded, and in fact, specifically noted that I had denied Liberty Mutual's motion as to the costs of preparing the site assessments required by the NOR.  <u>See</u> December 5, 2003 Memorandum and Order at 113.

For present purposes, there are four theoretical categories of expenses at Bostik Middleton: (1) costs associated with the 1986 NOR that are allocable to the duty to defend, (2) costs associated with the 1986 NOR that are allocable to the duty to indemnify, (3) costs associated with the eventual cleanup order that are allocable to the duty to defend, and (4) costs associated with the eventual cleanup order that are allocable to the duty to indemnify.[2]  The December 5, 2003 Memorandum and Order granted Liberty Mutual's motion with respect to categories 3 and 4.  On the other hand, it did <u>not</u> grant Liberty Mutual's motion with respect to categories 1 or 2.

Of course, the December 5, 2003 Memorandum and Order addressed cross-motions for summary judgment, and both parties have now stipulated that remaining questions regarding the duty

---

[2]Some of these pigeonholes may be purely theoretical.  I am not persuaded that any actual expenses may properly be placed in categories 2 or 3.

to defend may be decided by the court as factfinder.  I find no evidence to convince me by a preponderance of the evidence that Liberty Mutual was prejudiced by Black & Decker's voluntary compliance, without notice to Liberty Mutual, with the NOR and its requirement of a site assessment.  Indeed, Liberty Mutual did not present any evidence whatsoever concerning prejudice at the trial.  Therefore, with respect to Bostik Middleton, I find on the facts of this case that there was no such prejudice.

I turn to Liberty Mutual's legal argument that pre-notice defense costs must always be excluded, because the duty to defend does not exist until notice is given.  This is a question on which courts have split.  Judge Keeton has held, albeit without citation to authority and as an alternative holding, that under Massachusetts law pre-notice defense costs are unrecoverable even in the absence of prejudice.  Hoppy's Oil Serv., Inc. v. Ins. Co. of N. Am., 783 F. Supp. 1505, 1509 (D. Mass. 1992) (Keeton, J.)[3]; see also Managed Health Care Sys., Inc. v. St. Paul Fire & Mar. Ins. Co., No. 98-10831, 2001 WL 34114949, *2 (D. Mass. Sept. 28, 2001) (O'Toole, J.) (citing Hoppy's Oil); Am. Mut. Liability Ins. Co. v. Beatrice Co., 924 F. Supp. 861, 872 & n.17 (N.D. Ill. 1996) (applying Massachusetts law and citing both Hoppy's Oil and various cases from other states).  Under this approach, prejudice analysis "applies only to the insurer's attempt to assert lack of

_____

[3]Judge Keeton found, as an alternative basis for judgment, that the insurer had been prejudiced by the insured's late notice.  See Hoppy's Oil, 783 F. Supp. at 1510-11.

notice as a <u>policy defense</u> against payment even of losses and costs incurred <u>after</u> belated notice," and not to the pre-notice costs themselves.   <u>Xebec Dev. Partners, Ltd. v. Nat'l Union Fire Ins. Co.</u>, 12 Cal. App. 4th 501, 566-67 (1993) (emphasis in original), <u>rev. denied</u> (Apr. 1, 1993).

By contrast, other courts have held that prejudice analysis should apply not just to the existence of a duty to defend after late notice, but also to whether it includes pre-notice costs. <u>See, e.g.</u>, <u>TPLC, Inc. v. United Nat'l Ins. Co.</u>, 44 F.3d 1484, 1493 (10th Cir. 1995) (applying Pennsylvania law, which, like Massachusetts law, requires prejudice to establish late notice defense, and concluding that pre-notice costs are reimbursable except insofar as insurer can show prejudice); <u>Wyman-Gordon Co. v. Liberty Mut. Fire Ins. Co.</u>, No. 96-2208A, 2000 WL 34024139, *6-7 (Mass. Super. Ct. July 14, 2000) (rejecting Liberty Mutual's argument that, even without prejudice, insurer has no duty to reimburse pre-notice defense costs, and stating that <u>Hoppy's Oil</u> was "not . . . persuasive . . . because there, the court based its holding largely on a finding of prejudice to the insured from late notice as the result of lost evidence").

An especially insightful analysis was provided by <u>Aetna Casualty & Surety Co. v. Dow Chemical Co.</u>, 44 F. Supp. 2d 847 (E.D. Mich. 1997).  It sharply disagreed with the insurer's claim that the duty to defend could not possibly arise before notice or tender, and found that this approach would:

confuse events which give rise to the duty to defend

(an underlying suit is brought against the insured with
allegations that are arguably within the insurance
policy's indemnification provisions) and events which
give rise to an insurer's breach of that duty
(awareness of the need for defense and an unjustified
refusal to defend). . . . [T]he duty to defend
pre-exists any obligation on the part of the insured as
to notice or compliance with the voluntary payment
provision of an insurance contract. . . . The duty
arises when the underlying claim is brought and thus
pre-exists the insured's obligation to notify its
insurer of that suit.

Id. at 857.  The Dow Chemical court eventually held that a

genuine issue of material fact existed as to whether the insured

could recover pre-notice defense costs.[4]

Another insightful analysis is provided in Sherwood Brands,

Inc. v. Hartford Accident & Indemnity Co., 698 A.2d 1078 (Md.

1997), which I will excerpt at some length because I find it

particularly persuasive.  The court there granted review to

consider the sole question of whether the insured could recover

pre-notice defense costs.  It noted that the insurer's right to

control the defense would arise even without notice:

[I]t would seem clear that the right to control the
defense necessarily attaches as soon as there is
something to defend.  The correlative duty of the
insured to notify the insurer promptly of an occurrence
or a claim is obviously in aid, and assumes the right,

———————————————

[4]The insured's theory of pre-notice coverage relied on a
somewhat unusual argument.  It contended that the insurer had in
past cases raised "coverage defenses that raise the same issues
raised by the plaintiff in the underlying action against the
insured," thus creating a conflict of interest between insurer
and insured, and therefore that the insured was entitled to
conduct its own defense and seek reimbursement later.  See 44 F.
Supp. 2d at 860-61.  The court denied the insured's motion
because of a dispute of fact concerning whether such a conflict
would actually arise.  Id. at 861.

> of immediate control by the insurer.  As a practical
> matter, of course, that right cannot be effectively
> exercised until the insurer is, in fact, informed of
> the occurrence or claim, but it would hardly be sound
> to conclude that the right does not <u>exist</u> or does not
> <u>arise</u> until the notice is given, for if that were the
> case, the right of control vested in the insurer would
> effectively be within the control of the insured.

<u>Id.</u> at 1083 (emphasis in original).  The <u>Sherwood Brands</u> court

then observed that "[t]he duty to defend, rationally, should

attach at the same moment the correlative right to control

attaches, i.e., . . . when an insured occurrence happens.  If

that is when the insurer has a right to exercise control, that is

also when its duty to do so should arise."  <u>Id.</u> at 1083-84.

The Maryland court acknowledged that many courts had held

that the duty to defend does not arise until notice is given, and

agreed that "[in states] [w]here the duty of notification is

regarded as a condition precedent to the insurer's duty to

defend, a holding that the duty to defend does not arise until

the notice is given is logical."  <u>Id.</u> at 1084.  But it concluded

that such a rule made no sense in a state (like, I note,

Massachusetts) that requires prejudice for a late notice defense:

> Where, as in Maryland, however, the duty to notify is
> merely a covenant that, absent a showing of prejudice,
> does not excuse the insurer from complying with its
> duty to defend, the logic of such a holding becomes
> significantly attenuated, for it creates a time gap
> between the insurer's right to control the defense and
> its duty to provide one that has no legal underpinning.

<u>Id.</u>

<u>Sherwood Brands</u> set forth an alternative analysis that I

9

find quite sensible:

> Under the approach we take -- that the duty to defend
> arises upon the happening of the insured event but that
> the duty is not breached until, after notice of the
> event, the insurer unjustifiably declines to fulfill
> its obligations -- at least three possibilities bearing
> on the insurer's exposure for pre-notice litigation
> expenses are presented: (1) following a delayed notice,
> the insurer undertakes the defense, (2) following a
> delayed notice, the insurer declines to undertake the
> defense based on the delayed notice . . . , or (3)
> following a delayed notice, the insurer declines to
> undertake the defense for some other reason that would
> likely have been asserted without regard to the delayed
> notice.

Id. at 1085-86.  In the third scenario, which corresponds to the

situation at Whitman (among other sites in this litigation), the

analysis "is the most clear cut." Id. at 1086.  If the late-

notified insurer declines defense on the grounds that the claims

were not even potentially covered, and the court eventually finds

that the claims were potentially covered -- and therefore that

the insurer breached the duty to defend -- then "the insurer is

liable for all damages incurred by the insured as a result of

that breach." Id.  "If the delay in giving notice is not a

factor in the insurer's decision not to defend -- if it would

have declined the defense in any event based on its mistaken

conclusion that there was no potential coverage -- the insurer

should not later be allowed to use the delay as a bar to

reimbursing the insured for the reasonable expenses incurred in

defending the covered claim." Id. at 1086-87.

    I conclude that the question of when the duty arises is

distinct from when the duty is <u>breached</u>, and in a state like
Massachusetts -- which, like Maryland, requires prejudice for the
late notice defense -- notice is deemed an independent obligation
of the insured, not a condition precedent to coverage.  The
widely-followed late notice doctrine under which post-notice
costs are recoverable absent prejudice, but pre-notice costs are
<u>per se</u> excluded, is in tension with the underpinnings of
Massachusetts's analysis of the notice clause.  I hesitate to
disagree with Judge Keeton, particularly on questions of
insurance law, but reflection persuades me that <u>Hoppy's Oil</u> does
not represent the best rule -- or, more pertinently, the law of
Massachusetts, <u>see</u> <u>Wyman-Gordon</u>, 2000 WL 34024139, at *6-7 -- on
this point.[5]  I predict that the Supreme Judicial Court, if
confronted with these arguments, would find that pre-notice
defense costs are recoverable absent prejudice.

        This brings me full circle.  I granted Liberty Mutual's
motion for summary judgment in part on the issue of late notice
and voluntary payment for Bostik Middleton, but not for Whitman.
The primary reason is quite simple: Liberty Mutual did not argue
these defenses for Whitman, either in its motion for summary

_____

        [5]Liberty Mutual rightly notes that the principle stated in
<u>Hoppy's Oil</u> is the majority rule, and cites two treatises to that
effect.  <u>See</u> Barry R. Ostrager & Thomas R. Newman, 1 <u>Handbook on
Insurance Coverage Disputes</u> § 5.02, at 206 (12th ed. 2004); Allan
D. Windt, 1 <u>Insurance Claims & Disputes</u> § 4:44, at 469 (4th ed.
2001).  However, this does not change my conclusion.  In a state
(like Massachusetts) where late notice is only a complete defense
if the insurer has been prejudiced, the <u>Sherwood Brands</u> approach
is simply more analytically coherent.

judgment or at trial.[6]  Consequently, I could simply deem those
defenses waived for that site.

     That said, Liberty Mutual would not have been entitled to
summary judgment on these defenses for the Whitman site even had
it so requested.  As I read the summary judgment record, DEP
issued an NOR for the Whitman site, but not a subsequent cleanup
order.  In my December 5, 2003 Memorandum and Order I held that
"the insured's voluntary compliance with an order to prepare
assessments violates the voluntary payments provision only as to
the cost of preparing the assessments, not as to the ultimate
cleanup costs," and furthermore that "[e]ven 'voluntary'
performance of site assessments does not forfeit coverage unless
there has been prejudice to the insurer."  December 5, 2003
Memorandum and Order at 93; MSM Indus., Inc. v. Zurich Am. Ins.
Co., 1997 WL 260059, *9 & n.11 (D. Mass. 1997) (Gertner, J.,
adopting the order of Karol, M.J.), aff'd, 125 F.3d 841 (1st Cir.
1997) (unpublished table decision).  In the specific case of
Bostik Middleton, I found that it "unlikely that, had Liberty
Mutual been able to assume Black & Decker's defense, it could
have contrived a way to avoid conducting [site] assessments."

------------------------------------

     [6]To be strictly accurate, Liberty Mutual did not, in its
motion for summary judgment, argue the late notice defense for
Bostik Middleton.  However, it argued that the payments were
voluntary.  See Pl.'s Motion for Summary Judgment, Doc. 138, at
126.  Concerning the Bostik Middleton site, I specifically found
prejudice to Liberty Mutual on the basis of both voluntary
payments and late notice, each providing evidence of prejudice
for the other.  See December 5, 2003 Memorandum and Order at 111.

December 5, 2003 Memorandum and Order at 110.  In the absence of
any contrary evidence, I find likewise for Whitman.

        To sum up, at Whitman there was nonprejudicial voluntary
compliance with an assessment order, and no evidence of voluntary
compliance with a cleanup order.  My finding of prejudice at
Bostik Middleton was based on the presence of <u>both</u> late notice
<u>and</u> voluntary compliance with a cleanup order.  <u>See id.</u> at 111-
12; <u>cf. id.</u> at 92 (noting that Massachusetts cases finding
prejudice as a matter of law "appear to be limited to a breach of
<u>both</u> the notice <u>and</u> voluntary payment provisions").  Since
Liberty Mutual did not submit evidence of that crucial second
element -- voluntary compliance with a cleanup order -- it would
not be entitled to partial summary judgment at Whitman on those
defenses.

        In conclusion, since the law of Massachusetts does not
exclude pre-notice expenses absent prejudice, and the only
category of expenses for which prejudice has been established
(either at summary judgment or at trial) are those attributable
to DEP's cleanup order at Bostik Middleton, it follows that all
other pre-November 1994 defense expenses at the Bostik Middleton
and Whitman sites are potentially recoverable.

        **B.    Prejudgment Interest**

        Black & Decker has requested prejudgment interest under
Mass. Gen. Laws ch. 231, § 6C calculable from thirty days after
the billing date of each invoice potentially reimbursable under
the duty to defend.  Liberty Mutual argues that prejudgment

interest does not start to run until some point after Black &
Decker presented paid invoices to Liberty Mutual, or, at the very
least, after the date on which Black & Decker can show that it
actually paid each invoice.

On the surface, at least, Massachusetts law is clear on this
point:

> The dates of the payment of the various bills, which
> are readily ascertainable, determine the points at
> which [the insured]  was obliged to commit sums which
> it rightfully should not have been obliged to commit.
> . . . Therefore, prejudgment interest . . . should be
> calculated in this case on the basis of the various
> dates on which the legal bills were paid by [the
> insured].

Sterilite Corp. v. Cont'l Cas. Co., 397 Mass. 837, 842 (1986).
However, in a Memorandum and Order that I have issued today in
related litigation, I explained that Sterilite must be understood
in the context of its facts.  See generally Memorandum and Order
Regarding Pre-Judgment Interest, Liberty Mutual v. Black &
Decker, No. 04-10648, at 12-16 (D. Mass. Aug. 25, 2004).

In that Memorandum, I addressed cases where Liberty Mutual
had reimbursed Black & Decker for defense costs (but not interest
thereon) during the pendency of the litigation.  I held that
Black & Decker was not entitled to statutory prejudgment
interest, because there was no "verdict, finding or order for
judgment for pecuniary damages" as § 6C requires.  See id. at 8-
9.  However, I also explained that Black & Decker could pursue
damages representing the lost time value of money at market
rates, running from sixty days after payment for pre-notice

14

expenses and from the date of payment (per <u>Sterilite</u>) for post-notice expenses. <u>See id.</u> at 16-20.

The Bostik Middleton and Whitman claims present in a different posture: there <u>have</u> been findings, verdicts, and orders for judgment establishing Liberty Mutual's liability for pecuniary damages, and Liberty Mutual has not paid the principal. While the findings, verdicts, and orders have not stated the <u>amount</u> of damages, § 6C does not appear to require an adjudication so final that it is ready for execution. Rather, it is satisfied when the parties have forced the court (and/or a jury) to resolve the merits of the dispute.

Therefore, I hold that Black & Decker is entitled to prejudgment interest under § 6C for the Bostik Middleton and Whitman claims. Black & Decker must demonstrate when each bill was paid. The interest will run from sixty days after payment for pre-notice expenses, or from the date of payment (per <u>Sterilite</u>) for post-notice expenses, to the date of judgment.

### C. Standards for Determining Reasonableness of Legal Fees and Costs

The parties agree that only "reasonable" legal fees and expenses are recoverable. Where they differ is which standards apply to determine whether a given line item is reasonable or not. Liberty Mutual urges, via the expert opinion of Charity Dobbins Connor, the criteria employed by Legalgard, a company that specializes in reviewing legal invoices. Black & Decker, on the other hand, urges the general Massachusetts common law

standards developed in <u>Berman v. Linnane</u>, 434 Mass. 301 (2001),
and its progeny.  Without venturing into the details of
particular bills, suffice it to say that in at least some
instances, a court exercising its discretion under <u>Berman</u> would
approve expenses that Legalgard would not.

The insured's right to attorney's fees under the duty to
defend is contractual in origin.  Accordingly, the types of fees
reimbursable are, in the ordinary course of business, determined
through the contractual relationship.  It seems clear that, if an
insurer receives timely notice of a claim and accepts the duty to
defend, it can insist that the insured's counsel comply with
(reasonable) billing and practice management policies devised by
the insurer or a company it retains, such as Legalgard.
Presumably, if the insured's counsel's bills do not comply with
the insurer's requirements, the insurer can instruct counsel to
change its billing and litigation management practices so as to
come into compliance.  This is a key element of the insurer's
"right" to assume the insured's defense.

The purpose of contract damages is to put the party
suffering from the breach in as good a position it would be in
had there been no breach.  <u>Restatement (Second) of Contracts</u> §
347 cmt. a (1981).  If Black & Decker had timely submitted notice
of the Bostik Middleton and Whitman claims to Liberty Mutual, and
Liberty Mutual had assumed the defense, Black & Decker's defense
costs would have been subject to the limitations of whatever
reasonable cost management policies Liberty Mutual employed at

the time.[7]  Of course, it is doubtful that Liberty Mutual would
have assumed the defense even given timely notice.  But to the
extent that a certain cost _would_ be recoverable under the
discretionary standards of Massachusetts law, yet would _not_ be
recoverable under the business criteria that Liberty Mutual would
have employed at the time, Liberty Mutual is _ipso facto_
prejudiced by the late notice.  Permitting recovery based on more
generous Massachusetts law standards would give Black & Decker
more than it would have been entitled to had Liberty Mutual
properly assumed the defense.  Therefore, I hold that pre-notice
costs are subject to the objective criteria for reviewing defense
cost claims that Liberty Mutual employed at the time that the
costs were incurred.

        However, where the insurer, after receiving notice, wrongly
declines to defend, it should not be able to take advantage of
these internal policies.  Having declined to involve itself in
the insured's conduct of the litigation once notified, it is in
no position _ex post_ to complain that the insured's billing and
litigation management policies do not meet its private criteria.
The insurer that declines defense after notice cannot claim
prejudice in the form of billing format or litigation practices
that do not meet its standards, since it could have assumed the
defense and imposed those standards.  Therefore, I hold that
post-notice fees and expenses are subject to the general

_____

        [7]Perhaps these would be the same as Legalgard's current
rules; the record does not indicate.

17

standards of Massachusetts law, and not to the "business rules" or "standard protocols" created by private entities.[8]

## III. Scope of Reimbursable Indemnity Costs

Liberty Mutual moves for an order that the damages recoverable from its breach of the duty to indemnify are excluded by the "deemer" clause. In the alternative, it argues that the damages must be allocated pro rata among the various years in which damage occurred, including those in which no coverage is available; are subject to reduction under the "non-cumulation of liability" clause in the excess liability policies; and must be reduced by the amount of any payments made to Black & Decker by other insurers for the same occurrences.

---

[8]I further note that, while I have not decided the question, it is doubtful that Ms. Connor would qualify as an expert witness. I anticipate that the reasonableness of attorney's fees will be determined in the first instance by a special master, appointed by me, with considerable expertise in evaluating legal fees. Should any disputes remain after the expert's report, I will decide the reasonableness of legal fees. I strongly doubt that Ms. Connor possesses "specialized knowledge" that "will assist the trier of fact to understand the evidence or to determine a fact in issue" as Fed. R. Evid. 702 requires. Cf. Watkins v. Kmart Corp., No. 96-4566, 1998 WL 355525, *5 (E.D. Pa. June 29, 1998) (finding that Legalgard employee did not qualify as expert, "based on his educational background and lack of any published documentation in the field of attorneys fees, and the fact that he had not been recognized as an expert in any court of record"). Of course, to the extent that Ms. Connor is able to help Liberty Mutual find items to object to, her services may nevertheless be quite useful. See, e.g., In re Unisys Corp. Retiree Med. Benefits ERISA Litig., 886 F. Supp. 445, 475-76 (E.D. Pa. 1995) (finding that Legalgard analysis was not dispositive, but "[n]evertheless, the Legalgard analysis did help the court to locate areas of possible duplication").

A.    "Deemer" Clause

USM's policies beginning on November 1, 1957 contain a "deemer" clause within the definition of the policy period.[9] That clause states that:

> [I]njury to or destruction of property caused by exposure to conditions over a period of days, weeks, months or longer . . . shall be deemed to occur only on the last day of the last exposure to such conditions. The policy does not apply to such injury, death or destruction caused by such continuous or repeated exposure any part of which occurs after the termination of the policy.

Liberty Mutual contends that the environmental damage at the Bostik Middleton and Whitman sites was "caused by exposure to conditions over a period of days, weeks, months or longer," and therefore under this provision it must be "deemed to occur only on the last day of the last exposure to such conditions."  The exposure at the sites continued well after the termination of USM's coverage in 1979 (let alone the termination of <u>available</u> coverage in 1969) -- perhaps until the sites were remediated in the 1980s and afterwards.  Therefore, Liberty Mutual argues, under the policies the damage is deemed to occur on a date when there was no insurance coverage.

Furthermore, under the clause's second sentence, the policy "does not apply to such injury . . . caused by such continuous or repeated exposure <u>any part of which</u> occurs after the termination

---

[9]The clause does not appear in USM's May 18, 1956 to November 1, 1957 CGL policy or its 1966-68 EL policies.

of the policy." (emphasis added).  Under this limitation provision, Liberty Mutual argues, a given policy only covers continuous or repeated exposures that ended within that policy period.  Since a "part" of the exposure occurred after the termination of each of the USM policies, Liberty Mutual contends, no policy provides coverage.  Black & Decker responds with a careful distinction between injury caused over time by continuous exposure to the same harmful agent deposited on a single occasion, and multiple injuries, each caused immediately by incremental deposits of a harmful agent discharged over a long period of time.

The "deemer" clause has been extensively discussed in the case law.  Compare, e.g., Monsanto Co. v. Aetna Cas. & Sur. Co., No. 88C-JA-118, 1993 WL 563247 (Del. Super. Ct. Dec. 21, 1993) (Missouri law) (finding provision unambiguous and in accordance with interpretation proffered here by Liberty Mutual, and rejecting extensive parole evidence, comparable to that submitted here by Black & Decker, that contradicted plain meaning) with Endicott Johnson Corp. v. Liberty Mut. Ins. Co., 928 F. Supp. 176, 182 (N.D.N.Y. 1996) (finding provision ambiguous between meanings of "(1) all property damage at the . . . sites shall be deemed to occur on the last day of the 'occurrence' -- the day that the last dumping took place; and (2) all property damage at the sites shall be deemed to occur on the last day of contamination -- the day the waste is cleaned up," and construing

20

ambiguity against insurer), <u>appeal dismissed</u>, 116 F.3d 53 (2d

Cir. 1997) <u>and</u> <u>Am. Home Prods. Corp. v. Liberty Mut. Ins. Co.</u>,

565 F. Supp. 1485, 1499 (S.D.N.Y. 1983) (Sofaer, J.) (finding

provision unambiguous, but rejecting Liberty Mutual's

interpretation, holding instead that it does not apply where

harm-causing exposure occurred before policy termination date,

and resulting damage continues after that date), <u>aff'd in part &</u>

<u>mod. on other grounds</u>, 748 F.2d 760, 762-65 (2d Cir. 1984).

Only one Massachusetts decision speaks decisively to this

question.  Judge Murphy of the Superior Court rejected Liberty

Mutual's interpretation:

> Application of the "deemer" clause to this situation
> would require the leaching to cease before any policy
> is triggered. . . . the leaching may never cease and no
> policy would be triggered.
>
> It would be difficult or impossible to apply the
> "deemer" clause consistently to gradual pollution
> damage.  The pollution damage may never be cleaned up
> and there will be no last day of exposure.
> Governmental remediation orders do not in many cases
> require cleanup.  The order may call for monitoring the
> source of the pollution or cleanup as much as is
> practical or capping a site with gravel or removing
> contaminated soil.  Finally, the language of the
> "deemer" clause is inconsistent with its application to
> partial cleanup of gradual pollution.  The "deemer"
> clause clearly states that cessation of exposure, not
> substantial cleanup, is the event that triggers the
> policy.
>
> Accordingly, this court is of the opinion that the
> Massachusetts appellate courts would adopt the
> so-called injury-in-fact theory as best reflecting the
> intent of the policy language.  Therefore, coverage for
> property damage caused by gradual pollution would be
> afforded by the policy or policies in force when the

21

property damage occurred . . . .

<u>United Techs. Corp. v. Liberty Mut. Ins. Co.</u>, No. 877172, 1 Mass.
L. Rptr. 91, 1993 WL 818913, *22 (Mass. Super. Ct. Aug. 3, 1993).

The persuasive authority, including the only Massachusetts
court to construe the clause, favors Black & Decker's
interpretation.  I adopt this approach and confine my additional
comments to the following.

The deemer clause appeared in the policies at the
approximately the same time as coverage for property damage,
which was in turn interpreted to include gradual damage.  <u>See CPC</u>
<u>Int'l, Inc., v. Northbrook Excess & Surplus Ins. Co.</u>, 962 F.2d
77, 94 n.45 (1st Cir. 1992).  If interpreted as Liberty Mutual
suggests, the deemer clause would render that coverage illusory,
not just for certain policy periods but for the entirety of the
duration of coverage.  I need not decide whether the clause is
(1) unambiguous in the manner Liberty Mutual suggests, but
unenforceable as against public policy, (2) unambiguous in the
manner Black & Decker suggests, and therefore inapplicable to the
present facts, or (3) ambiguous, and therefore construed in Black
& Decker's favor.  Suffice it to say that the policy that Liberty
Mutual describes is plainly not what USM purchased, and the SJC
has consistently "refused narrowly to construe policy terms which
would limit or defeat any coverage fairly intended to be given by
a policy described by the insurer in such broad terms
('Comprehensive General Liability Policy') as was this policy."

22

<u>Trustees of Tufts Univ. v. Commercial Union Ins. Co.</u>, 415 Mass.
844, 849 (1993) (internal quotation marks and citation omitted).

The purpose of the deemer clause was to prevent "stacking"
of claims, by assigning a claim to a single policy -- not by
completely excluding coverage.  The clause's effect is to limit
each individual accident to a single policy year.  For instance,
if a tank burst and a quantity of oil were released into the soil
and remained there for many years, the damage -- caused by
continuous exposure from the same injury -- would be deemed to
occur in the last year.[10]  However, "where property damage
occurred during every year that dumping took place, the [d]eemer
clause is inapplicable."  <u>Endicott Johnson</u>, 928 F. Supp. at 182
(dumping waste at landfill over period of many years caused
discrete injuries, not single continuous exposure).  In such
cases, there is not one accident, but many.  The evidence
presented at trial indicated virtually continuous dumping between
May 18, 1956 and January 1, 1969.

Similarly, the deemer clauses's second sentence -- which

_____

[10]An example of a substance that may not cause injury
immediately upon exposure, but only after gradually remaining in
place for a long time and further accumulating, is asbestos.  <u>See</u>
<u>Eagle-Picher Indus., Inc. v. Liberty Mut. Ins. Co.</u>, 682 F.2d 12,
20 & n.3 (1st Cir. 1982), <u>cert. denied sub nom. Froude v.</u>
<u>Eagle-Picher Indus., Inc.</u>, 460 U.S. 1028 (1983).  An even better
example might be damage resulting from exposure to a substance
that is not inherently injurious <u>at all</u>, but which can cause
damage if left in place for a long time, such as water.  <u>See</u>
<u>generally</u> <u>Amtrol, Inc. v. Tudor Ins. Co.</u>, No. 01-10461, 2002 WL
31194863, *5-6 (D. Mass. Sept. 10, 2002).

excludes injury "caused by such continuous or repeated exposure
any part of which occurs after the termination of the policy" --
does not exclude injury caused by exposures that occurred wholly
before the policy termination date.   Judge Sofaer construed this
sentence in American Home Products:

> [O]n its face the provision removes from coverage only
> injury, death, or destruction that is caused by
> continuous or repeated exposure occurring in part after
> November 1, 1976, the date [the insured] terminated the
> policy.  It does not remove from coverage harm caused
> wholly by exposure occurring prior to November 1, 1976.
> Nothing in the language of the provision takes such
> harm out of the policy simply because exposure to the
> same products continued after November 1, 1976, or
> indeed because further harm may have occurred from such
> continued exposure.  If, in a particular case,
> pre-November 1, 1976 exposure is found to have caused a
> particular harm, no exposure after November 1, 1976
> would be a cause of that particular harm; such harm is
> not "caused by . . . exposure any part of which"
> occurred after November 1, 1976, because all of that
> harm-causing exposure occurred before that date.

565 F. Supp. at 1498-99.  The Second Circuit affirmed:

> [R]ecognition of the sequence of cause and effect
> supports the court's rejection of Liberty's
> interpretation of the [provision] as eliminating its
> responsibility for injury that occurred during the
> policy period where exposure that commenced prior to or
> during that period continued thereafter.  An effect
> never precedes its cause.  The policies plainly give
> coverage for injury that occurred during the policy
> period and was caused by exposure to [the insured's]
> products; injury occurring during the policy period
> could not have been caused by an exposure that occurred
> thereafter.

748 F.2d at 765.

In other words, there is a difference between (1) a single
continuous exposure, (2) repeated exposure to the same injurious

cause, and (3) periodic, frequent exposures to various separate (even if materially identical) injurious causes. As stated above, the first category (continuous exposure) includes damage caused by substances that essentially sit in place and slowly cause injury, e.g., asbestos, already-spilled oil, lead paint, or even water. See supra note 10 and accompanying text. The second category (repeated exposure) includes damage caused by repetitions of the same cause, e.g., a leaking hose that drips a substance onto the ground. The third category (exposure not covered by the second sentence of the deemer clause) includes damage caused by physically distinct causes, even if they are essentially identical, e.g., workers dumping solvent into waste pits or floor drains, even if they dumped the same solvent at the same place every single day, or pipes repeatedly bursting and spilling oil, even if they burst quite frequently. The reason this third category is not covered by the second sentence of the "deemer" clause is that each injurious incident is caused by a physically and temporally distinct cause, even if there is a high degree of repetition, and a legally discrete injury occurs each time.[11]

---

[11]I recognize that determining whether damage was caused by a "continuous" exposure, a "repeated" exposure, or a great many highly similar yet distinct exposures borders on the metaphysical. However, I do not see any way to construe and apply the second sentence of the deemer clause without distinguishing that which is "continuous" and/or "repeated" from that which is neither.

Here, the evidence established that, at least for some aspects of injury at each site, the damage was caused by many individual instances of small-scale exposure, each causing an independent injury.  The second sentence of the deemer clause does not negate coverage in this circumstance.  Cf. Endicott Johnson, 928 F. Supp. at 182-83; Am. Home Prods., 565 F. Supp. at 1498-99.

Accordingly, I find that the deemer clause does not limit coverage in these cases.

**B.   Allocation of Damage to Individual Policy Periods**

The "Policy Period" section of each USM policy states that "[t]he policy applies only to . . . injury to or destruction of property . . . which occur[s] during the policy period." Policies starting in 1959 also contain a "limit of liability" clause stating a two million dollar "total aggregate limit of [Liberty Mutual's] liability for all damages . . . occurring during the policy period."  On the other hand, it also provides that the insurer will "pay on behalf of the [insured] all sums which the [insured] shall become obligated to pay by reason of the liability imposed upon it by law."  (emphasis added).  The (potential) tension between these provisions has given rise to two lines of cases: one limiting a given policy's coverage to injury occurring during that policy period, and the other making each policy period liable for "all sums" involved.

26

At first glance, it seems that the two provisions can be harmonized easily: each policy must reimburse the insured for "all sums" that the insured must pay due to "injury to or destruction of property . . . which occur[s] during the policy period."  In other words, the most natural reading is to foreclose debate on which <u>types</u> of expenses are covered.

By contrast, it seems odd to imagine that the insurer could write an occurrence policy that limits itself to injury occurring during the policy period, but that the policy would then apply to damage that occurred <u>outside</u> the policy period by the simple presence of the word "all."  Adopting this perspective, some courts have allocated damages among the various policy periods. <u>See</u> <u>Ins. Co. of N. America v. Forty-Eight Insulations, Inc.</u>, 633 F.2d 1212 (6th Cir. 1980), <u>mod. on reh'g</u>, 657 F.2d 814 (6th Cir. 1981), <u>cert. denied</u>, 454 U.S. 1109 (1981).

But there is another interpretation that distinguishes the <u>injury-causing event</u> from the <u>resulting damage</u>.  Under this theory, "if the insured's liability is 'because of' property damage during the policy period, the insurer is then responsible for all sums the insured is legally obligated to pay.  In other words, once a policy is triggered, that policy remains on the risk for continuing damage." <u>Am. Nat'l Fire Ins. Co. v. B&L Trucking & Constr. Co.</u>, 951 P.2d 250, 253 (Wash. 1998) (en banc); <u>Keene Corp. v. Ins. Co. of N. Am.</u>, 667 F.2d 1034, 1050 (D.C. Cir. 1981) (rejecting allocation across policies issued by different

27

insurers), <u>cert. denied</u>, 455 U.S. 1007 (1982); <u>Goodyear Tire &
Rubber Co. v. Aetna Cas. & Sur. Co.</u>, 769 N.E.2d 835, 840-42 (Ohio
2002) (same).

This is the approach that the Massachusetts courts have
taken.  In <u>Rubenstein v. Royal Insurance Co. of America</u>, 44 Mass.
App. Ct. 842, 852 (1998) ("<u>Rubenstein I</u>"), <u>aff'd in part on other
grounds</u>, 429 Mass. 355 (1999) ("<u>Rubenstein II</u>"), the
Massachusetts Appeals Court stated that "[c]ourts in other
jurisdictions have interpreted [the 'all sums'] language to mean
that, when multiple policies are triggered to cover the same
loss, each policy provides indemnity for the insured's entire
liability, and each insurer is jointly and severally liable for
the entire claim."  In <u>Rubenstein II</u>, the SJC granted further
appellate review only on the question of the availability of
attorney's fees.  <u>See</u> 429 Mass. at 356.[12]  <u>Rubenstein I</u> remains
the latest, if not necessarily the definitive, word on this issue
under the law of Massachusetts.  Furthermore, just last year, in
a case applying Illinois law, the Appeals Court again applied the

_____

[12]It appears from <u>Rubenstein</u>'s procedural record that the
appellants unsuccessfully sought further appellate review on the
question of allocation.  However, the SJC's denial of further
appellate review on a particular issue, like the United States
Supreme Court's denial of certiorari, in no way suggests approval
of the decision below.  <u>See</u> <u>Ford v. Flaherty</u>, 364 Mass. 382, 387-
88 (1973) ("An order by this court denying further review should
not be considered in any case as an affirmation of the decision
or reasoning of the Appeals Court."); <u>Grieco v. Hall</u>, 487 F.
Supp. 1193, 1199 nn.14 & 18 (D. Mass. 1980) (Tauro, J.) (citing
<u>Ford</u>), <u>aff'd on other grounds</u>, 641 F.2d 1029 (1st Cir. 1981).

"all sums" theory of joint liability across policies.  It noted parenthetically that "[t]hough not influencing our opinion here, . . . this analysis was also utilized in [Rubenstein I], where this court affirmed the trial judge's imposition of joint and several liability on an insurer, based on the continuous contamination of the subject property during the policy period." Chicago Bridge & Iron Co. v. Certain Underwriters at Lloyd's, London, 59 Mass. App. Ct. 646, 660 n.14 (2003), rev. denied, 441 Mass. 1101 (2004).

My task is not to decide which is the better rule.  Indeed, were it to me in the first instance, I might well reject the "all sums" theory.  See, e.g., Olin Corp. v. Ins. Co. of N. Am., 221 F.3d 307, 322-23 (2d Cir. 2000) (describing "all sums" approach as "intuitively suspect").  The idea of joint and several liability derives from tort, not contract, and is somewhat awkward in the contract context.  But my task is to determine what the law of Massachusetts is.  While the SJC itself has not actually spoken, the Massachusetts Appeals Court has -- in a case which the SJC thereafter reviewed, albeit on different issues. "'[A]n intermediate appellate state court . . . is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'" Comm'r v. Bosch's Estate, 387 U.S. 456, 465 (1967) (quoting West v. AT&T, 311 U.S. 223, 237 (1940)); Fid. Union Trust Co. v.

29

<u>Field</u>, 311 U.S. 169, 177-78 (1940) ("An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question."); <u>Hamm v. Latessa</u>, 72 F.3d 947, 955 n.12 (1st Cir. 1995) ("Intermediate appellate court decisions are trustworthy data for ascertaining state law, and, in the absence of other telltales indicating that the state's highest tribunal would have ruled otherwise, we believe it is prudent to accept the appeals court's interpretation as authoritative.") (internal quotation marks and citation omitted), <u>cert. denied</u>, 519 U.S. 856 (1996).

I find nothing in Massachusetts law inconsistent with the legal policy announced by the Massachusetts Appeals Court in <u>Rubenstein I</u>:  There is to be no allocation among policies, let alone years of exposure or injury.

C.  **"Non-Cumulation of Liability" Clauses**

The USM EL policies contain a "non-cumulation of liability" clause providing that "[i]f the same occurrence gives rise to . . . property damage . . . which occurs partly before and partly within any annual period of this policy, the limit of liability of this policy shall be reduced by the amount of each payment made by [Liberty Mutual] with respect to such occurrence, either under a previous policy or policies of which this is a

30

replacement, or under this policy with respect to previous annual periods thereof." This provision essentially means that the insured cannot get double recovery from EL policies. For example, if an occurrence straddles the 1966 and 1967 EL policy periods, and money is paid from the 1966 EL policy to cover some of the damage arising from that occurrence, then for purposes of the 1967 EL policy, the occurrence must be viewed as already partly paid.

Black & Decker argues, and I agree, that this is not ripe for adjudication. While I tend to agree with Liberty Mutual that this clause appears unambiguous and enforceable, and eminently sensible besides, it is not clear how this clause would apply on the present facts, given my holding that <u>Rubenstein I</u> applies. The total amount of damages sought for Bostik Middleton and Whitman could be easily covered by USM's CGL policies without resort to EL coverage at all. Of course, later cases might increase the demands on those policies and trigger EL coverage, and under those circumstances I might need to decide how the clause applies. But I will defer that decision until then. For now, suffice it to say that the clause appears to be enforceable, but its implications on the present facts are unclear and need not be decided until an actual problem emerges. Liberty Mutual will be deemed to have preserved the issue within the context of this litigation assuming it raises the clause again if and when a concrete issue arises.

D.    **Reduction for Settlement from Aetna**

Liberty Mutual argues that the damages it owes for Bostik Middleton and Whitman, after all the above calculations, must be reduced by any settlement money paid by Aetna relative to these two sites.[13]  "Any award of damages against [the insurer] which did not credit the settlements seems to provide cumulative damages for indemnity."  Rubenstein I, 44 Mass. App. Ct. at 856; see also Restatement (Second) of Contracts § 347 cmt. a (1981) (injured party's damages limited to actual loss caused by breach, and collateral source rule of tort law does not apply to contract damages).  As a general principle, this is correct, and Black & Decker does not really argue otherwise.

Black & Decker objects that in this case the settlement agreement has not been made part of the record.  But Liberty Mutual's counsel represents that Black & Decker has allowed him to review the agreement on the express condition that he cannot communicate its content to his client or to the court.

Liberty Mutual has a right to a reduction in damages equal to the portion of the Aetna settlement, if any, that can be

_____

[13]Liberty Mutual refers to this as a "set off," although that term more properly refers to a reduction of A's claim against B by the amount that B owes A -- each claim is "set off" against the other.  See generally Comm'r of Ins. v. Munich Am. Reinsurance Co., 429 Mass. 140, 142 (1999) (setoff is between "mutual debtor-creditors").  Here, Liberty Mutual seeks a reduction of A's claim against B by the amount that C paid A, which is more properly described as a credit for a collateral source benefit.  See generally Dan B. Dobbs, 1 Law of Remedies § 3.8(1), at 372-75 (2d ed. 1993).

allocated to the Bostik Middleton and Whitman sites.[14]  Black &
Decker argues that the Aetna settlement did not relate to the
Bostik Middleton and Whitman sites.  To the degree that this
becomes an issue for resolution, at an appropriate time Black &
Decker may move for an appropriate protective order and submit
the settlement for in camera review, with sealed memoranda from
the parties.  Cf. Rubenstein I, 44 Mass. App. Ct. at 855-56
(noting that total amount of settlement was disclosed but terms
were not in record).

---

[14]If the settlement does not identify specific sites, then
one appropriate calculation method might be, after final
judgment, to divide the amount of damages attributable to these
sites by the total amount of damages; multiply that ratio by the
amount of the Aetna settlement, if any, attributable to
indemnity; and then subtract that product from the damages
attributable to these two sites.

## IV.  Attorney's Fees in Declaratory Judgment Action

Black & Decker moves for attorney's fees in the instant declaratory judgment action.  It argues that not only is it entitled to fees and expenses specifically related to the Bostik Middleton and Whitman sites, but also a portion of fees and expenses that were not related to _any_ specific site, and a portion of fees related to lost policy issues.  Liberty Mutual counters that Black & Decker is not entitled to attorney's fees at all, because it defended itself before notifying Liberty Mutual.  Even if Black & Decker _is_ entitled to fees from the declaratory judgment action, Liberty Mutual argues, it is only entitled to fees attributable to the duty to _defend_, not those attributable to the duty to indemnify, and certainly not fees related to lost policy issues.

### A.  Existence of Common Law Right to Fees

An insured that must litigate the existence of the duty to defend, and prevails, is ordinarily entitled to attorney's fees and expenses occurred in prosecuting the declaratory judgment action.  Rubenstein II, 429 Mass. at 356-61.  The logic behind this exception to the "American Rule" (under which each side ordinarily bears its own litigation expenses) is that the purpose of litigation defense protection is to relieve the insured from the need to pay for the costs of litigation, and that this purpose is undermined if the insurer _itself_ forces the insured to

34

litigate:

> [T]o preclude such recovery would "permit[] the insurer
> to do by indirection that which it could not do
> directly.  That is, the insured has a contract right to
> have actions against him defended by the insurer, at
> its expense.  If the insurer can force him into a
> declaratory judgment proceeding and, even though it
> loses in such action, compel him to bear the expense of
> such litigation, the insured is actually no better off
> financially than if he had never had the contract right
> mentioned above."

Id. at 357 (quoting Preferred Mut. Ins. Co. v. Gamache, 426 Mass.

93, 97 (1997)).  The fees are a form of damages, to be sure, but

are not a conventional remedy for breach, because they do not

depend on a breach: they are available even if the insurer did

defend the insured, but reserved its right to later contest the

duty to defend and in fact did so (by hypothesis,

unsuccessfully).  See Hanover Ins. Co. v. Golden, 436 Mass. 584,

588 (2002).

Liberty Mutual contends that the policy behind Rubenstein

does not apply here, because in that case the insured sought a

defense and was denied, whereas here Black & Decker was evidently

perfectly content to defend itself (and remediate contamination)

for years without notifying Liberty Mutual.  From the fact that

the insured in Rubenstein gave timely notice, Liberty Mutual

infers that timely notice is "the linchpin" of a fee award under

Rubenstein.

I do not see how timeliness of notice has any impact

whatsoever under Rubenstein and its progeny.  In Rubenstein, the

insurer attempted to distinguish <u>Gamache</u> on the grounds that, in
that earlier case, the insured, "because of his insurer's refusal
to defend, was required to retain his own counsel for the
underlying action," whereas in <u>Rubenstein</u>, the insured was
"advanced [its] defense costs by other insurers."  429 Mass. at
357.  The court characterized this attempted distinction as
simply "not persuasive."  <u>Id.</u>  Furthermore, <u>Rubenstein</u> emphasized
that the right to attorney's fees does not depend on why the
insurer denied coverage, or which party initiated the declaratory
judgment action, but rather "exclusively on whether that coverage
is ultimately determined to exist."  <u>Id.</u> at 360 (internal
quotation marks and citation omitted).

Taken together, <u>Rubenstein</u> and <u>Golden</u> teach that the insured
is entitled to attorney's fees from the declaratory judgment
action whether the insured was literally left to fend for itself,
or whether it was defended by other insurers, or whether it was
in fact defended by the very insurer against which it was
required to litigate the question of the duty to defend.  The
exclusive question is whether the insurer erred (even in good
faith) in denying coverage.  Timeliness of notice is not a
prerequisite, and it is easy to see why not: Notice is not a
condition precedent to coverage, but rather an independent duty
of the insured.  <u>See supra</u> pp. 8-11.  Since (by hypothesis) the
insured has prevailed in the declaratory judgment action, the
breach of the notice obligation was without prejudice (i.e.,

harmless) and did not excuse the insurer from its duty to reimburse defense costs.  Therefore, in Massachusetts, the late-notified but unprejudiced insurer is in exactly the same position as the timely-notified insurer.  Whether or not this identity of position extends to every possible context, it does not impact the insured's right to attorney's fees in a declaratory judgment action once the insurer has received notice.[15]

Consequently, an insured that has established the duty to defend is entitled to fees under Rubenstein regardless of whether notice was timely or not.  Of course, to the extent, if any, that the insured did not prevail in the declaratory judgment action due to prejudicially late notice, the fee award should be reduced, just as it would for a partial failure to prevail on any other ground.  Here, I hold that Black & Decker is, as a general matter, entitled to recover fees under Rubenstein to the extent that it prevailed in establishing the duty to defend.  It can recover both fees and expenses that are specifically and exclusively related to establishing the duty to defend at the Bostik Middleton and Whitman sites, and an allocable portion of fees and expenses related to establishing the duty to defend that are not specific to any site but rather cut across the entire

---

[15]Liberty Mutual argues that the only prejudice at issue in a motion for fees under Rubenstein is the prejudice suffered by the undefended insured.  This is incorrect.  Rubenstein does not involve a prejudice analysis at all.  Indeed, in Rubenstein and Golden, the insureds were not prejudiced, since their defense costs were fully covered by insurers.

litigation.[16]

**B.   Fees for Issues Other Than the Duty to Defend**

Liberty Mutual argues that, under <u>Rubenstein</u>, only fees specifically attributable to establishing the duty to defend are recoverable.  Black & Decker counters that <u>Rubenstein</u> permits recovery of fees associated with establishing the duty to indemnify, and a particular provision in the insurance policies at issue permits recovery of fees associated with proving the existence and terms of lost policies.

1.   Duty to Indemnify and <u>Rubenstein</u>

The dispute over the recoverability of fees related to establishing the duty to indemnify derives from an apparent latent ambiguity in the language used in <u>Rubenstein</u>.  The SJC there quoted language from <u>Gamache</u> establishing that "an insured 'is entitled to the reasonable attorney's fees and expenses incurred in successfully establishing the insurer's duty to <u>defend</u> under the policy.'"  <u>Rubenstein</u>, 429 Mass. at 359 (quoting <u>Gamache</u>, 426 Mass. at 98) (emphasis added).  The duty to indemnify was not mentioned.

On the other hand, it was clear from the procedural history

---

[16]The method for calculating the percentage of those non-site-specific defense expenses must be determined after final judgment has been reached on all sites.  While I need not decide the calculation method at this point, one obvious choice would be to divide the site-specific defense expenses for Bostik Middleton and Whitman by the sum of all site-specific defense expenses, and then multiply that ratio by the sum of all non-site-specific defense expenses.  <u>See supra</u> note 14.

of <u>Rubenstein</u> that the insureds had sought and obtained a
declaration below that the insurer had <u>both</u> duties, defense and
indemnity.  429 Mass. at 356.  The SJC's order remanded the case
to the trial court "for assessment of the reasonable attorney's
fees and expenses incurred by the [insured] in prosecuting <u>the
declaratory judgment action</u>." <u>Id.</u> at 360-61 (emphasis added).
This could encompass both duties.  Furthermore, the SJC's remand
order explicitly excluded "fees and expenses incurred by the
[insured] in establishing the existence, terms, and conditions of
the missing insurance policies issued by the defendant." <u>Id.</u> at
361.  This suggests, by negative implication, that the SJC did
<u>not</u> exclude fees and expenses associated with establishing the
duty to indemnify.

In short, the SJC left open the present question, and I must
predict how it would rule.  Two factors lead me to adopt Liberty
Mutual's interpretation.  First, the availability of fees for an
action at contract is an extraordinary exception to the American
Rule, and therefore should be construed narrowly.  Second, the
logic behind the <u>Rubenstein</u> rule suggests a relevant distinction
between the two duties.  The theory is that an insurance policy
contains two distinct types of coverage: liability insurance and
"litigation insurance." <u>See</u> 429 Mass. at 358.  The insured's
purpose in obtaining litigation insurance is to avoid being
forced to bear the costs of litigation; if it must litigate
against the insurer at its own expense to establish the

39

litigation coverage, the purpose of that coverage is defeated.

By contrast, the purpose of liability coverage is to avoid being forced to bear the costs of an adverse judgment. That purpose is not inherently undermined by the need to litigate, any more than the purpose of any other contract is undermined by the need to litigate.[17]  Accord Diocese of Winona v. Interstate Fire & Cas. Co., 916 F. Supp. 923, 933 (D. Minn. 1995) (considering same question and reaching same conclusion under Minnesota law), aff'd in part & rev'd in part, 89 F.3d 1386 (8th Cir. 1996).  It may be useful to construct a hypothetical in which the duty to defend and the duty to indemnify were contained in separate insurance policies.  The logic of Rubenstein would apply to the former, but not the latter, and I do not see how combining them into the same policy changes this.

For these reasons, fees attributable to establishing the existence and scope of the duty to indemnify are not recoverable under Rubenstein, and Black & Decker must segregate its fees and expenses accordingly.  This may present some complications for the Bostik Middleton litigation.  The existence of the duty to defend at Whitman was decided on summary judgment, and therefore Black & Decker's fees related to establishing that duty must be limited to motion practice and hearings.  The existence of the

---

[17]Of course, the purpose of every contract is undermined if litigation is required.  But the American Rule essentially states that the law will not remedy that particular loss.

duty to defend at Bostik Middleton is somewhat more complicated, because the summary judgment order left open the issue of prejudice.  Liberty Mutual could have argued at trial (but chose not to) that it had no duty to defend at Bostik Middleton because it was prejudiced by Black & Decker's late notice and voluntary payments.  While an appropriate assumption would be that Black & Decker's fees related to the duty to defend at Bostik Middleton were also limited to those associated with motion practice and hearings, I do not wish to foreclose completely the possibility that certain line items may be properly attributable to Black & Decker's trial preparation in anticipation of a possible prejudice argument by Liberty Mutual.[18]

2.    Alternative Contractual Basis for Fees

Black & Decker concedes, as it must, that Rubenstein excludes fees relating to proving the existence and terms of lost policies.  See 429 Mass. at 361.  And I have found, above, that Rubenstein excludes fees relating to proving the duty to

---

[18]I further note that, even at summary judgment, the two duties were briefed and argued together.  To the extent (if any) that Liberty Mutual attempted to use extrinsic evidence of the facts at a particular site to argue against the existence of the duty to defend, Black & Decker may have been obligated to respond in kind.  If Black & Decker can convince a special master that Liberty Mutual invited Black & Decker to enter the arena of factual argument in the dispute over the duty to defend, the master might properly conclude that certain factual discovery and argument was required to refute Liberty Mutual's arguments concerning the duty to defend and therefore fees are allocable to Black & Decker for that effort.

indemnify.  However, Black & Decker points to a clause in the
policies requiring Liberty Mutual to "reimburse the insured for
all reasonable expenses, other than loss of earnings, incurred at
the company's [i.e., Liberty Mutual's] request."  Black & Decker
argues that when an insured is forced to defend a declaratory
judgment action brought by the insurer, it is litigating "at the
company's request."  In essence, this is an alternative theory of
fees: not the damages-based theory of <u>Rubenstein</u>, under which
fees are needed to put the insured in the position it would have
been in but for the insurer's insistence on litigating the
existence of the duty to defend, but rather the theory that fees
have been <u>authorized</u> by the insurer.

    Courts have split as to whether attorney's fees in
declaratory judgment actions qualify as "expenses incurred at the
company's request."  <u>Compare, e.g.</u>, <u>Citizens Ins. Co. of Am. v.
Charity</u>, 871 F. Supp. 1401, 1404 (D. Kan. 1994) (insurer's
"filing of a declaratory judgment action constitutes a 'request'
on the part of [the insurer] under the contract language, and
therefore the company is obligated to reimburse" the insured)
<u>with</u> <u>Milwaukee Mechs. Ins. Co. v. Davis</u>, 198 F.2d 441, 445
(Former 5th Cir. 1952) ("To say that a plaintiff in a declaratory
judgment action, or for that matter in any law suit, 'requests'
the defendant to employ attorneys to contest the action, is a
mere play upon words and is contrary to the real substance of the
transaction."); <u>see</u> <u>also</u> Jane Massey Draper, Annotation,

Insured's Right to Recover Attorneys' Fees Incurred in
Declaratory Judgment Action to Determine Existence of Coverage
under Liability Policy, 87 A.L.R.3d 429 §§ 8[a]-[b] (1978 & Supp.
2004) (collecting cases supporting both positions).  Once again I
must attempt to predict how the SJC would rule.

It is important to focus on precisely what is at stake in
order to give context to the decisions of various state courts.
Massachusetts is slightly unusual in that it accords a right to
attorney's fees based on a damages-based theory that does not
depend on the "incurred at the company's request" provision.  But
Massachusetts expressly excludes expenses related to establishing
lost policies, and also (I have found) implicitly excludes
expenses related to establishing the duty to indemnify.  Black &
Decker seeks to use the "incurred at the company's request"
provision to fill the gaps in Rubenstein.

In many cases that have authorized fees based on that
provision, however, it was the only basis for attorney's fees in
that state.  See, e.g., Great W. Cas. Co. v. See, 185 F. Supp. 2d
1164, 1173 (D. Nev. 2002); Flannery v. Allstate Ins. Co., 49 F.
Supp. 2d 1223, 1232-33 (D. Colo. 1999); Am. States Ins. Co. v.
Angstman Motors, Inc., 343 F. Supp. 576, 587 (D. Mont. 1972).  In
other cases, the provision was considered an alternative ground
for authorizing fees.  See, e.g., Guar. Nat'l Ins. Co. v.
McGuire, 173 F. Supp. 2d 1107, 1115 (D. Kan. 2001) (awarding fees
on basis of this provision because of a dispute whether damages-

43

based theory, available under Kansas law, applied in that case);
Olympic S.S. Co. v. Centennial Ins. Co., 811 P.2d 673, 680-81 &
n.5 (Wash. 1991) (both damages-based theory and contract
provision provide basis for fees); Cohen v. Am. Home Assurance
Co., 258 A.2d 225, 239 (Md. 1969) (fees are recoverable "whether
one speaks in terms of its having authorized the expenditure by
its failure to defend or whether one speaks in terms of the
attorney's fees for the declaratory judgment action being a part
of the damages sustained by the insured by [the insurer's]
wrongful breach of the contract").

In only a few decisions has a court in a state that awards
declaratory judgment attorney's fees under a damages-based theory
considered the contract provision as a possible source of
recovery for fees that would otherwise not be recoverable.  In
Bankers & Shippers Ins. Co. v. Electro Enterprises, Inc., 415
A.2d 278 (Md. 1980), a group of tort plaintiffs who would not
otherwise qualify under Maryland's damages theory of attorney's
fees argued that the contract provision gave them the right to
fees.  The court disagreed, for the reason (not on point here)
that the insurer's defense obligation did not apply to tort
plaintiffs even if they were within the literal definition of
insureds.  See id. at 283.  It did not, however, state that the
contract provision could never provide "gap-filling" recovery.

The question is not without difficulty, but ultimately I
predict that the SJC would not construe the "expenses incurred at

44

the company's request" provision to provide a complete
alternative basis for declaratory judgment fee recovery that
would cover areas not covered by Rubenstein itself.  The logic of
finding a basis for fees in that contractual phrase is a bit
strained:

> The obvious purpose and meaning of the language in the
> policy is that [the insured] will be paid expenses for
> assisting in the trials and hearings involving . . .
> the third party.  It defies belief that [the insurer]
> "requested" [the insured] to "assist" in the
> declaratory judgment action or that [the insured] aided
> [the insurer] in the investigation or defense in the
> declaratory judgment action.

State Farm Fire & Cas. Co. v. Sigman, 508 N.W.2d 323, 327-28
(N.D. 1993) (Vandewalle, C.J., dissenting); Milwaukee Mechs. Ins.
Co., 198 F.2d at 445 (theory of fee award under this provision is
"a mere play upon words and is contrary to the real substance of
the transaction").  I strongly suspect that those state courts
that have used it as a basis for awarding fees have done so
simply because, for one reason or another, it was a more readily
available tool under their jurisprudence than the damages theory
used by Rubenstein.  In particular, I do not believe that the
SJC, having limited recovery to expenses attributable to
establishing the duty to defend, would interpret this relatively
vague and innocuous clause as covering the entirety of
declaratory judgment attorney's fees and expenses.

Accordingly, I find that only fees attributable to the duty

45

to defend are recoverable under Massachusetts law.[19]

## V.  Conclusion

Liberty Mutual's motion for judgment as a matter of law or partial new trial (Doc. 492) is DENIED.

Black & Decker's motion for judgment as a matter of law (Doc. 500) is DENIED.

Liberty Mutual's motion to establish the amount of reimbursable defense costs (Doc. 502) is DENIED to the extent that it seeks to exclude, as a matter of law, money spent before November 3, 1994, other than those fees and expenses attributable to DEP's cleanup order at Bostik Middleton; DENIED to the extent that it seeks to establish that prejudgment interest is not available; DENIED to the extent that it seeks to establish that Legalgard's standards for attorney's fees should govern defense costs billed after November 3, 1994; and GRANTED to the extent that it seeks to establish that the standards for attorney's fees that it applied before November 3, 1994 should apply to defense costs incurred before November 3, 1994.

Liberty Mutual's motion to establish limits on damages payable (Doc. 505) is DENIED to the extent that it seeks to establish that the deemer clause bars coverage; DENIED to the

---

[19]That said, for the sake of preparing a complete record Black & Decker would be well advised to submit evidence to the special master sufficient to enable a determination of the amount of fees attributable to establishing the duty to indemnify and to establishing lost policies, even though I have found those two categories not to be reimbursable.

extent that it seeks to establish pro rata allocation among policies; DENIED without prejudice to the extent that it seeks to establish that the "non-cumulation of liability" clause applies; and GRANTED to the extent that it seeks to establish that Liberty Mutual is entitled to a reduction in damages equal to the amount, if any, of the Aetna settlement that can be fairly attributed to indemnification for the Bostik Middleton and/or Whitman sites.

Liberty Mutual's motion to prohibit Black & Decker from recouping attorney's fees in the declaratory judgment action (Doc. 509) is DENIED to the extent that it seeks to establish that fees attributable to establishing the duty to defend may not be recovered; and GRANTED to the extent that it seeks to establish that fees attributable to establishing the duty to indemnify or to establishing lost policies may not be recovered.

Black & Decker's motion for attorney's fees in the declaratory judgment action (Doc. 507) is GRANTED to the extent that it seeks to establish that fees attributable to establishing the duty to defend may be recovered; and DENIED to the extent that it seeks to establish that fees attributable to establishing the duty to indemnify or to establishing lost policies may be recovered.

Liberty Mutual's motion to prohibit Black & Decker from recouping attorney's fees in the declaratory judgment action (Doc. 509) is DENIED as moot in light of my ruling on Black & Decker's motion for attorney's fees in the declaratory judgment

47

action.

/s/ Douglas P. Woodlock

_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE